DONALD R. COTTLE AND JULIA A. COTTLE (NOW JULIA A. RAYL), PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3524-82.        Filed September 9, 1987.

*Curtis W. Berner*, for the petitioners.
*Theodore Garelis*, for the respondent.

CHABOT, *Judge*: Respondent determined a deficiency in Federal individual income tax against petitioners for 1977 in the amount of $177,238. After concessions by petitioners, the issues for decision are as follows:

(1) Whether petitioners properly reported the gain realized from the sale of 3 four-plex apartment buildings as long-term capital gain; and

(2) Whether a 25-percent distributive share of the income of a partnership is taxable to petitioner-husband or to DRC Enterprises, Inc., petitioner-husband's wholly owned corporation, to which petitioner-husband had transferred his 25-percent general partnership interest in the partnership in a section 351[1] transaction.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioner Donald R. Cottle (hereinafter sometimes referred to as Cottle) resided in Sacramento, California, and petitioner Julia A. Cottle (now Julia A. Rayl) (hereinafter sometimes referred to as Rayl) resided in Annapolis, Maryland. Petitioners were husband and wife during 1977 and filed a joint income tax return for that year.

Before engaging in the real estate transactions described hereinafter, the only real property Cottle had ever owned was his personal residence. Cottle, who held two business degrees, was involved for about 15 years in marketing

---

[1]Unless indicated otherwise, all section, subchapter, and chapter references are to sections, subchapters, and chapters of the Internal Revenue Code of 1954 as in effect for the year in issue.

(research and sales), advertising, new product development, consulting, and publishing.

In 1975, Cottle became interested in investing in real estate. He undertook a course of study in this field. He took a State real estate salesperson's license examination, passed it, and secured from the State of California a license to sell real estate. His license remained effective during 1977, but expired in October 1979. Cottle did not renew the license and he never used the license to earn income by selling real estate.

## Gambetta Park

Sometime in late 1975 or early 1976, Cottle learned of an apartment complex known alternatively as Villa Lausanne or Gambetta Park (hereinafter sometimes referred to as Gambetta Park) from Nick Oddo (hereinafter sometimes referred to as Oddo), a co-owner with Cottle in C&O Enterprises (hereinafter sometimes referred to as Enterprises). Gambetta Park is located in Daly City, California, on Lausanne Avenue and Gambetta Street, two cul-de-sac streets abutting the westerly slope of San Bruno Mountain. The apartment complex was comprised of 21 four-plex units, with each four-plex unit containing four apartments. Thus, there were 84 apartments in Gambetta Park. [2] Enterprises described the four-plex units, in an April 9, 1976, circular (hereinafter sometimes referred to as the offering circular) to prospective purchasers, as follows:

The twenty-one four-plexes are approximately ten years old and have identical, very functional floor plans. Each [apartment] unit contains two bedrooms, living room with dining area, kitchen and 1½ bathrooms. * * *

There are two floors of living area over four-car garages, with one space assigned to each [apartment] unit. * * * [T]he property has been allowed to "slide", and, in our opinion, is in need of a general overhaul. New appliances, drapes, carpeting, interior and exterior painting are needed. In addition, a new management program is needed that maintains a very firm control over the property, the tennants [sic], and the resident manager.

We believe that the opportunity for appreciation of value of the property is very substantial, particularly with continuing inflation of

---

[2]For purposes of clarity, in the Gambetta Park portions of this report the term "four-plex unit" will refer to one of the 21 structures containing 4 apartments each; the term "apartment" will refer to one of the 84 apartments.

construction replacement costs, (see page 25 of the appraisal) and particularly since the sales price is $6,000 to $7,000 below the current market value.

The circular then discusses the likely rental level, cash-flow, and tax shelter aspects of depreciation and interest deductions.

Cottle wanted to acquire some real property and became interested in Gambetta Park. He believed that the four-plex units were a good investment and that their value would improve substantially if the project could be controlled by a group of owners sharing common goals. Cottle could afford to buy only 3 of the four-plex units, however. He was concerned that his money would be tied up in this project for some time and, thus, believed that by buying only 3 four-plex units he could spread the risk of his investment.[3]

Cottle carefully selected the 3 four-plex units that he was interested in buying, based on the condition and location of the units. He considered using 1 of the apartments as his personal residence. However, the owner, Robert Marshall (hereinafter sometimes referred to as Marshall), was not willing to sell less than the entire 21 four-plex units in the project. Thus, Cottle and Oddo arranged for Marshall to sell all 21 four-plex units at once in the following manner: Cottle and Oddo would buy 3 four-plex units and 2 four-plex units, respectively, and Enterprises would buy the remaining 16 four-plex units[4] using funds supplied by a lender. Marshall was to be paid about $60,000 per four-plex unit. Then, in accordance with the offering circular, Enterprises would sell the 16 four-plex units, using "back-to-back escrows", to people who could finance their purchases with loans arranged by Enterprises. That is, Enterprises would buy the 16 four-plex units from Marshall and immediately resell the units to these other people. However, the price to be paid by the other people was $78,500 per four-plex unit. Of this amount, about $7,400 was to be retained by the lender in an escrow account to cover the estimated cost of refurbishing each four-plex unit.[5] The approximate $11,000 difference

[3]Cottle had not previously rehabilitated buildings.

[4]Cottle originally planned to buy only 2 four-plex units. Thus, the offering circular states an intention to sell 17 four-plex units. However, Cottle ultimately decided to buy 3 four-plex units; thus, only 16 four-plex units were to be sold by Enterprises.

[5]The lender withheld this amount until the work was done and Cottle and Oddo submitted invoices for payment.

between the $60,000 per four-plex unit paid by Cottle, Oddo, and Enterprises and the net purchase price (i.e., the purchase price net of the estimated refurbishing costs) to be paid by the other people to Enterprises was to be held in a reserve contingency fund for unanticipated rehabilitation expenses and to compensate Cottle and Oddo for their personal efforts in managing and rehabilitating Gambetta Park. Any amounts spent in excess of the amounts withheld by the lender and the amounts in the reserve contingency fund were to be borne by Cottle and Oddo.[6]

On June 9, 1976, in accordance with the foregoing plan, Cottle bought the following 3 four-plex units (hereinafter sometimes referred to collectively as the Four-Plexes) and paid therefor the amounts shown in table 1:

Table 1

| Four-plex unit | Amount paid[7] |
| --- | --- |
| 56 Edgewood Court..................... | $60,165 |
| 70 Edgewood Court..................... | 60,169 |
| 84 Edgewood Court..................... | 60,165 |

Of the 16 four-plex units that passed through Enterprises, Cottle's friends bought 12, Oddo's friends bought 2, and the remaining 2 were bought by an official of the lender that provided financing for the purchase from Marshall.

During the year after Cottle bought the Four-Plexes, Cottle spent about 60 hours each week on the following activities with regard to the 21 four-plex units: evicting tenants; temporarily relocating tenants while their apartments were being refurbished;[8] firing the resident manager and personally taking over the day-to-day management of Gambetta Park; buying refrigerators, stoves, washers, dryers, garage door lifts, carpets, and drapes for all the apartments and having these items installed in the apartments; replacing the subflooring; and hiring and physically

---

[6] In fact, because of unanticipated rehabilitation problems, Cottle spent more than $50,000 over the amount retained in escrow and was not reimbursed for these sums by the other buyers.

[7] Cottle financed the purchase of the Four-Plexes and incurred loan fees, as follows:

| | Loan amount | Loan fee |
| --- | --- | --- |
| 56 Edgewood Court | $62,400 | $1,037 |
| 70 Edgewood Court | 62,400 | 1,037 |
| 84 Edgewood Court | 62,800 | 1,046 |

[8] In some instances, the rents to be paid by these tenants were reduced during the periods when the tenants were temporarily relocated.

assisting the subcontractors in performing the work. During this year, the rents from the 21 four-plex units were pooled so that no one owner would experience a large negative cash-flow while the units were being refurbished.

Cottle spent the following amounts in improving each of the four-plex units:

| | |
|---|---:|
| Garage door lift | $260 |
| New refrigerator and stove | 1,823 |
| New carpeting | 2,130 |
| New drapes | 433 |
| New washer and dryer | 598 |
| Total | 5,244 |

During the period that Cottle held the Four-Plexes, he received rental income from and incurred operating expenses for each four-plex unit as shown in table 2.

Table 2

| | 56 Edgewood Court | | 70 Edgewood Court | | 84 Edgewood Court | |
|---|---|---|---|---|---|---|
| | 1976 | 1977 | 1976 | 1977 | 1976 | 1977 |
| Rental income | $5,534 | $3,901 | $5,534 | $3,901 | $5,534 | $3,901 |
| Expenses: | | | | | | |
| Repairs—carpentry | 1,170 | --- | 1,170 | --- | 1,170 | --- |
| Repairs—painting | 1,259 | --- | 1,259 | --- | 1,259 | --- |
| Repairs—miscellaneous | 355 | --- | 355 | --- | 355 | --- |
| Repairs—additional | 1,600 | --- | 1,600 | --- | 1,600 | --- |
| Insurance | 122 | 217 | 122 | 217 | 122 | 217 |
| Interest | 2,898 | 2,810 | 2,898 | 2,655 | 2,995 | 2,843 |
| Legal and accounting | --- | 123 | --- | 123 | --- | 123 |
| Management fees | 344 | 200 | 344 | 200 | 344 | 200 |
| Property taxes | 1,147 | 917 | 1,147 | 917 | 2,145 | 917 |
| Utilities | 443 | 324 | 454 | 321 | 440 | 253 |
| Miscellaneous | --- | 307 | --- | 307 | --- | 307 |
| Fire protection | 55 | --- | 55 | --- | 55 | --- |
| Depreciation | 2,789 | 1,486 | 2,789 | 1,486 | 2,789 | 1,486 |
| Total expenses | 12,182 | 6,384 | 12,193 | 6,226 | 13,274 | 6,346 |
| Net loss | (6,648) | (2,483) | (6,659) | [9](2,375) | (7,740) | [10](2,420) |

[9]So stipulated. The arithmetic sum of the stipulated components is ($2,325). We do not know if the error is in the parties' addition or in their transcription of one or more of the components.

[10]So stipulated. The arithmetic sum of the stipulated components is ($2,445). We do not know if the error is in the parties' addition or in their transcription of one or more of the components.

The rental income that Cottle received in 1976 and 1977 from each of the Four-Plexes did not cover the expenses Cottle incurred with respect to each of the Four-Plexes even without regard to depreciation. However, Cottle expected that there would be positive cash-flow after the rehabilitation was completed.[11]

About 6 months after Marshall sold the 21 four-plex units, two of the new owners had to sell some of their four-plex units.[12] Cottle and Oddo had the rehabilitation work on these four-plex units completed first in order to facilitate the sales of these four-plex units. Cottle was surprised that these four-plex units were sold at substantial profits. The new purchasers of these units did not participate in the rent pooling arrangement during the remainder of the rehabilitation period.

By April 1977, Oddo contacted the remaining owners of the four-plex units about selling their units. Oddo wanted the owners to sell their four-plex units because (1) he wanted the owners to participate in a new project (see discussion of Concord-Oak Grove Associates, *infra*), and (2) he was experiencing cash-flow problems and, as the broker for Gambetta Park, he could sell the four-plex units on behalf of the owners and earn commissions.[13] Oddo was successful in convincing the other owners, including Cottle, to sell their four-plex units. Although Cottle initially did not want to sell the Four-Plexes, he finally decided to do so because of the change in circumstances at Gambetta Park. That is, with the influx of new owners on the resale of the other four-plex units, Cottle believed that he had lost control over maintaining the quality of Gambetta Park and its tenants. Cottle was concerned that Gambetta Park would deteriorate to its preacquisition condition. Cottle was the last of the four-plex units owners to sell. Thus, about

[11]One reason for the expected positive cash-flow was the fact that the rents on the rehabilitated apartments were raised about $10 to $25; thus the initial rents for rehabilitated apartments were in the $240 to $245 range, resulting in the receipt of about $960 per month for each four-plex unit.

[12]Oddo sold one of his 2 four-plex units because of unanticipated cash-flow problems; another owner sold his four-plex unit as a result of his divorce and community property settlement.

[13]With regard to resales of the four-plex units, the offering circular states as follows: "[W]e [Enterprises] ask for a 120 day exclusive right to sell your four-plex, as broker, if you choose to sell your four-plex within 5 years of close of escrow, at the then prevailing real estate sales commission for property of this kind."

June 24, 1977, after the expiration of the holding period for long-term capital gain purposes (see note 24 *infra*), Cottle sold the Four-Plexes, realizing the amounts of gain shown in table 3.

Table 3

| Four-plex unit | Amount of gain |
|---|---|
| 56 Edgewood Court.................... | $56,869 |
| 70 Edgewood Court.................... | 56,871 |
| 84 Edgewood Court.................... | 56,875 |
| Total............................ | 170,615 |

Cottle did not have to advertise or engage in any sales promotional activities with regard to the sale of the Four-Plexes. Oddo knew of many potential buyers as a result of the original two resales and referred these buyers to Cottle.

Cottle used the proceeds from the sales of the Four-Plexes to (1) buy with Oddo a 50-percent interest in nine lots at a development known as Incline Village for $25,000, (2) pay some estimated taxes, (3) pay household expenses, and (4) invest $75,000 in an antique business to be run by Rayl. Thus, of the $170,615 in gain that Cottle realized from the sale of the Four-Plexes, he reinvested only $25,000, or less than 15 percent of the gain, in real estate.

From April 1977 through October 1977, Cottle personally participated, as both a general and limited partner, in a California limited partnership known as Concord-Oak Grove Associates, that bought an apartment complex with the intention of converting it to a condominium and selling the units. He retained only his limited partnership interest as of October 21, 1977, after having transferred his general partnership interest to his wholly owned corporation, DRC Enterprises, Inc. (hereinafter sometimes referred to as DRC). See discussion, *infra*.

In addition to acquiring a real estate interest at Incline Village, Cottle, through DRC, engaged in the following real estate transactions after he sold the Four-Plexes: (1) In 1978, DRC was the general partner in a partnership that bought a 98-apartment complex in Vallejo, California, converted the apartment units into condominiums, and sold them; and (2) after completing the Vallejo operation, DRC

became a two-thirds partner in buying a rundown estate at Lake Tahoe, Nevada, rehabilitating the estate, and then selling it.

Petitioners did not have any losses in 1977 from sales or exchanges of property used in the trade or business.

When Cottle bought the Four-Plexes, he intended to use them in what was for him a new trade or business of renting apartments. Although possible profit on resale of the Four-Plexes was considered, it was not the primary purpose for which Cottle bought and held the Four-Plexes. Cottle's primary purpose in renovating and refurbishing the Four-Plexes was to enhance their rentability, not their salability.

Cottle used the Four-Plexes in his trade or business. In 1977, when Cottle sold the Four-Plexes, he did not hold the Four-Plexes primarily for sale to customers in the ordinary course of his trade or business.

### Concord-Oak Grove Associates

In early 1977, Cottle learned from Oddo of the Eighty-Eight Oak Grove Apartments, located at 1060 Oak Grove Road, Concord, California, which is a 93-apartment complex (hereinafter sometimes referred to as the property). After looking at the property, Cottle became interested in the property as a possible investment. Thus, on or about April 1, 1977, Cottle and Oddo, as the general partners, and 12 other individuals including Rayl, as the limited partners, formed Concord-Oak Grove Associates (hereinafter sometimes referred to as Associates), a California limited partnership. Associates was on a cash method of accounting. Cottle and Oddo each held a 25-percent general partnership interest, and Rayl held a 2-percent limited partnership interest, in Associates. At this time, the total of the general partnership interests (50 percent) and the limited partnership interests (49 percent) was 99 percent of the total interests in Associates. Shortly after Associates was formed, the limited partnership agreement was modified to add

Cottle as a 1-percent limited partner.[14] Before October 19, 1977, each limited partner executed a power of attorney authorizing Cottle and Oddo, jointly and severally, to execute, acknowledge, and file all documents on behalf of Associates that were consistent with the limited partnership agreement.

Associates' purpose was to acquire, manage, and convert the property into condominium units and then to sell the condominium units. Toward this end, on April 1, 1977, Associates opened an escrow account at First American Title Guaranty Co. (hereinafter sometimes referred to as First American), with regard to the purchase of the property. In addition, Oddo, on behalf of Associates, negotiated an option agreement with the Eighty-Eight Oak Grove limited partnership (hereinafter sometimes referred to as the seller), the owner of the property. The seller was not related to Associates. Although Associates and the seller executed the option agreement on April 12, 1977, the parties intended that the option agreement be effective as of April 1, 1977.

Pursuant to the option agreement, until March 31, 1980, Associates had (1) an option to buy the property, (2) the right to begin conversion of the property to condominium units before the close of escrow, (3) the obligation to manage and operate the property as an apartment complex on behalf of the seller without any compensation therefor, (4) the obligation to use income from the property to make deed of trust payments, payments for operating expenses, and contributions to reserves, and (5) the obligation to pay the foregoing amounts from Associates' own funds to the extent the income from the property was insufficient therefor. Associates paid to seller $275,000 for this option, which amount was to be applied towards the $2,025,000[15] purchase price for the property.

---

[14]So stipulated. The parties have not indicated whether it was originally intended that Cottle have a 1-percent limited partnership interest, whether Cottle's acquisition of the one-percent interest was a taxable transaction, and how one is to deal with partnership interests aggregating other than 100 percent. See *Johnsen v. Commissioner*, 83 T.C. 103, 130-131 (1984), revd. on another issue 794 F.2d 1157 (6th Cir. 1986). This puzzlement does not appear to affect any issue in the instant case.

[15]This amount was to be reduced if Associates' total net profits from the condominium conversion were less than $225,000. Moreover, the purchase price was payable as follows: Associates was to pay off the existing deed of trust against the property and deliver to the sellers a promissory note in the amount of the purchase price, less the $275,000 consideration for the option, and less the balance of the then existing deed of trust.

On execution of the option agreement, Cottle, as a general partner of Associates, undertook the day-to-day management and the conversion of the property to a condominium. In this regard, the following steps were accomplished by Associates by October 20, 1977: (1) As noted *supra*, an escrow account had been opened at First American; (2) as noted *supra*, an option agreement was entered into with the seller; (3) Associates obtained approval for the condominium conversion from the city of Concord and the State of California; (4) Billy J. Bundy (hereinafter sometimes referred to as Bundy) was hired to manage the sales program with respect to the condominium units; (5) Associates began substantial construction projects relating to the conversion of the property; (6) Associates began work on the property's landscaping; and (7) Associates accepted sales deposits on the condominium units and issued receipts therefor.

The regulations of the Real Estate Commissioner for the State of California (hereinafter sometimes referred to as the Real Estate Commissioner) for the year in issue required that a public report be issued by the Real Estate Commissioner in order for a condominium convertor to be permitted to offer condominium units for sale to the public. On September 1, 1977, the Real Estate Commissioner issued a Conditional Condominium Final Subdivision Public Report (hereinafter sometimes referred to as the report) which provides as follows:

THIS IS A CONDITIONAL PUBLIC REPORT. THE SUBDIVIDER IS NOT NOW IN A POSITION TO CLOSE ESCROWS AND CONVEY TITLE TO PURCHASERS. THE SUBDIVIDER HAS DEMONSTRATED THAT HE WILL BE ABLE TO DO SO SOON. THIS REPORT IS BEING ISSUED, THEREFORE, TO ALLOW THE SUBDIVIDER TO OFFER THESE UNITS FOR SALE AND TO ENTER INTO BINDING CONTRACTS WITH PURCHASERS.

THE CONDITION THAT THE SUBDIVIDER HAS NOT YET MET IS THE RECORDING OF THE SUBDIVISION MAP. THE SUBDIVISION MAP WILL BE RECORDED WHEN 50 OF THESE 93 UNITS CAN BE CLOSED SIMULTANEOUSLY. IF THE SUBDIVIDER HAS NOT MET THIS CONDITION WITHIN SIX (6) MONTHS, THIS REPORT SHALL BE NULL AND VOID, AND PURCHASERS MAY DEMAND A RETURN OF THEIR DEPOSITS.

> \*　　\*　　\*　　\*　　\*　　\*　　\*

TITLE: Title is vested in Eighty-Eight Oak Grove, a limited partnership, who has entered into an option agreement to sell to the subdivider,

Concord-Oak Grove Associates, a limited partnership. The property will be conveyed upon the recordation of the map.

\* \* \* \* \* \* \*

PURCHASE MONEY HANDLING: The subdivider must impound all funds received from you in escrow depository until legal title is delivered to you.

\* \* \* \* \* \* \*

The subdivider advises that individual escrows will not close until 50 percent of the lots/units have been sold. If the escrow has not closed on your lot within six (6) months of the date of your deposit receipt, you may request return of your deposit.

Thus, in accordance with the report, Associates could not record the subdivision map or close escrows and convey legal title with respect to any condominium unit until at least 50[16] of the 93 units could be closed simultaneously. However, the report authorized Associates to enter into binding contracts with condominium buyers in order to satisfy the 50-condominium-unit requirement for map recordation. Associates had 6 months, from September 1, 1977, until March 1, 1978, to get the map recorded.

Bundy managed the sales of the condominium units at the property. He had about 21 years' experience in the real estate industry and had participated in about 25 condominium conversions involving about 2,100 units. Bundy had certain concerns with regard to the marketing of the condominium units at the property. Some concerns were those typical to condominium conversions in general—e.g., hostility of tenants and the general public towards condominium conversions. Bundy was also concerned that the following factors specific to the property might affect the sale of condominium units: (1) The property, which was to be marketed as a high-priced condominium, was located near a low-priced condominium that he had helped to convert; (2) Bundy had previously experienced marketing difficulty in this location; (3) some of the tenants, who had been displaced because of other condominium conversions,

---

[16] It is not clear whether the last of the above-quoted excerpts from the report would have permitted escrows to close when 47 of the 93 condominium units (i.e., at least 50 "percent") were sold. The stipulations and the remainder of the report clearly require 50 condominium units. This difference between 50 percent and 50 units does not materially affect our analysis of this issue.

were forming coalitions and were lobbying local government groups; (4) one of the nine buildings that comprised the property was a three-story building with no elevators (Bundy had encountered buyer resistance in a prior three-story condominium conversion because many buyers were not interested in the middle level); (5) the property originally was built as a Housing and Urban Development project and its construction might be viewed as unsafe, particularly by potential buyers with children; (6) Cottle was naive as a condominium converter; (7) the Real Estate Commissioner required Associates to close a high percentage of sales simultaneously so that the lender could resell the mortgages to the Federal Home Loan Mortgage Corporation (hereinafter sometimes referred to as the FHLMC); and (8) the buyers were concerned that their money would be tied up in escrow without any interest accruing thereon and with no certain closing date.

Bundy described the marketing pattern at the property as a "unique sales program". That is, each buyer had to submit a deposit check and sign a formal deposit receipt (apparently, a contract to buy the condominium unit) before viewing the unit the buyer was interested in. Within a few days thereafter, the deposit receipt was then presented to Cottle for his approval and signature on behalf of Associates. Once Cottle's approval was obtained, Bundy had to make an appointment with the existing tenant so that the buyer could walk through and inspect the unit. The walk-through generally was required to occur within 5 days after entering into the contract. Buyers could and did cancel contracts because of Bundy's inability to schedule walk-throughs as a result of tenant resistance to the condominium conversion or because the buyers no longer were interested in the unit upon inspection.[17] Buyers who did not cancel their contracts after the walk-through were subject to

---

[17]If a buyer wished to be released from his or her contract, then it was Bundy's and Cottle's policy to release the buyer with a complete refund of the deposit. Bundy and Cottle had two reasons for this policy: (1) Bundy did not believe a specific performance clause in a real estate contract was enforceable, and (2) the report required Associates to close 50 sales simultaneously within a 6-month period; Bundy and Cottle thought they could satisfy this requirement more easily if they avoided prolonged and costly litigation by releasing unwilling buyers from their contracts. About one fourth of the contracts were formally canceled. However, this figure increases to about one-half if one also counts the informal cancellations—i.e., those where potential buyers canceled before the walk-through or put a deposit on a different unit after the walk-through.

the normal procedures that attend a typical home purchase transaction, e.g., qualification for a mortgage loan.

As of October 21, 1977, potential buyers had signed deposit receipts with respect to 81 of the 93 condominium units. Thus, as of this date, there remained 12 condominium units for which there were no potential buyers. Also, as of October 21, 1977, loans had been approved for only 36 buyers[18] of the 81 condominium units. As of October 21, 1977, Associates did not yet own the property and so it could not close the sale of any condominium unit.

The first closing of the escrow occurred on November 15, 1977; on that date, there were at least 50 buyers ready to close on their units. Thus, on that date, legal title to the property passed from the seller to Associates pursuant to the option agreement, Associates recorded the map pursuant to the report, and Associates conveyed legal title to unit buyers with respect to 53 condominium units.

The net proceeds available to Associates from the November 15, 1977, closing was $1,869,164.89. Of this amount, $1,826,281.97 was used to pay the balance of the purchase price for the property. Rents on the units were not to be prorated between the seller and Associates. Commissions payable by Associates to the real estate salesmen amounted to $38,620, with regard to the condominium sales that closed on November 15, 1977. These commissions were not paid through the escrow account.

After the first escrow closing, both Cottle and Bundy were not certain that the condominium conversion would be successful. They believed that the risk to Associates, as to whether the conversion ultimately would prove profitable, increased as of November 15, 1977, because (1) Associates became the owner of the unsold units and was therefore liable for the monthly homeowners' dues and taxes thereon; (2) the best units had been sold first and Associates was concerned about selling the less desirable units; (3) tenant vacancies accelerated after the first escrow closing since tenants no longer believed that the property would not be converted; and (4) Associates might have difficulty retaining lenders that would finance potential buyers' purchases of

---

[18]So stipulated. However, the parties' stipulated exhibit shows only 27 loans approved by Oct. 21, 1977, plus two buyers who paid in cash.

the condominium units if Associates could not guarantee that 80 percent of the units would be owner-occupied rather than investor-owned (this requirement had to be satisfied so that the lenders' financing packages could be resold to the FHLMC). Notwithstanding the foregoing concerns, by January 23, 1978, all of the remaining condominium units had been sold and, in fact, most of those units had been sold within 30 days after the November 15, 1977, escrow closing.[19] On its partnership information return for 1977, Associates reported that, for the period November 15, 1977, through December 31, 1977, it had net short-term capital gain of $905,878 (gross sales of $3,341,100 minus basis of $2,435,222) and interest income of $190.

During the summer of 1977, before the first escrow closing, Cottle considered incorporating his 25-percent general partnership interest in Associates. He considered doing so primarily because of the risks involved in a condominium conversion and because he wanted to limit his personal liability therefor.[20] However, Cottle was busy with the condominium conversion and so did not incorporate DRC until October 19, 1977. On that date, DRC was formed as a Nevada corporation with Cottle as its sole shareholder and Cottle holding all the corporate offices. On October 21, 1977, Cottle transferred to DRC, in a transaction that qualified under section 351, his entire 25-percent general partnership interest in Associates, in exchange for stock in DRC. Cottle retained his 1-percent limited partnership interest in Associates.[21] Thus, on November 15, 1977, when the first escrow closing occurred, DRC (and not Cottle) was a 25-percent general partner in Associates.[22]

After the condominium conversion of the property was completed, DRC continued to engage profitably in real estate

[19]Only two condominium units were unsold after Dec. 23, 1977; these units ultimately were sold to Enterprises.

[20]Cottle was concerned about the following matters: (1) A tenant group had formed to try to enjoin the conversion by limiting access to the units and discontinuing rent payments; (2) the financial consequences to him personally if the conversion failed; (3) his obligation to inform potential buyers that the Property was located in a flood hazard area (a fact he did not know when Associates acquired the Property); and (4) whether to exercise the option or walk away from the transaction.

[21]On Oct. 27, 1977, the First Amendment of Certificate of Limited Partnership of Associates was filed which substituted DRC in place of Cottle, as a general partner. In addition, Cottle was identified as a 1-percent limited partner in Associates. See text at note 14 supra.

[22]Cottle did not delay the closing of the escrow in order to accommodate the incorporation of his general partnership interest in Associates.

development activities. See discussion, *supra*. In April 1979, Cottle contributed the stock of DRC to North American Restaurant Investors, Inc. (hereinafter sometimes referred to as Investors), in a section 351 transaction. In that exchange, Cottle received about 46 or 47 percent of Investors' stock. It was intended that DRC continue as a separate corporation, handling real estate development. However, serious financial problems caused DRC to cease its real estate development activities.

Both Associates' and petitioners' income tax returns for 1977 were prepared by Roy A. Steiner (hereinafter sometimes referred to as Steiner), a Certified Public Accountant. Steiner was a friend of Cottle, and also held a 2-percent limited partnership interest in Associates. In preparing Associates' tax return for 1977 and the Forms K-1 thereto, Steiner knew that Cottle had incorporated his 25-percent general partnership interest on October 21, 1977, and he was aware of the Treasury regulations under section 706(c), in particular, section 1.706-1(c)(2)(ii), Income Tax Regs. Steiner was not aware of any agreement among Associates' partners as to how the partnership income was to be allocated between Cottle and DRC. Steiner used the interim closing of the books method to determine how to allocate between Cottle and DRC the 25-percent general partner's distributive share of profits from the sale of the condominium units that was earned by Associates. Steiner determined that, under this method, none of this distributive share was allocable to Cottle because (1) Cottle had incorporated his general partnership interest on October 21, 1977, and (2) as of October 21, 1977, Associates had no income on its books under its cash method of accounting. Thus, $226,518 was allocated to and included by DRC in its Federal income tax return filed for its taxable year ending June 30, 1978. This amount included a 25-percent distributive share of Associates' short-term capital gain of $905,878 (i.e., $226,470) and of Associates' ordinary income of $190 (i.e., $48) for the period ending December 31, 1977.[23] Steiner

---

[23]So stipulated. Also, this is the amount shown on Schedule K-1, attached to Associates' information return for 1977. However, the stipulated DRC tax return for its taxable year ending June 30, 1978, shows that only $226,508 was included in DRC's income. The parties have not explained this $10 discrepancy.

included in petitioners' tax return for 1977 their combined 3-percent limited partners' distributive share of short-term capital gain of $27,176 ($9,059 for Cottle; $18,117 for Rayl) and ordinary income of $6 ($2 for Cottle; $4 for Rayl).

---

The partners in Associates did not have an agreement to prorate between Cottle and DRC, the distributive share of Associate's income attributable to the 25-percent general partnership interest that Cottle transferred to DRC.

By October 21, 1977, Associates had not yet realized any income from the sale of condominium units that could be allocated to Cottle's 25-percent general partnership interest in Associates. Associates first realized such income on November 15, 1977, several weeks after DRC was substituted for Cottle as a general partner.

OPINION

## I. Gambetta Park

Petitioners contend that Cottle bought the Four-Plexes for investment and for use in his trade or business of renting apartments. They contend that (1) Cottle never held the Four-Plexes primarily for sale to customers in the ordinary course of his trade or business, and (2) Cottle's reason for selling the Four-Plexes was to liquidate his investment therein as a result of changed circumstances (i.e., control over the project was lost because of the sales by the other owners). Petitioners contend that, since Cottle held the Four-Plexes longer than 1 year,[24] the gains received from the sale of the Four-Plexes constituted long-term capital gain.

---

Associates reported $190 interest income, in addition to its $905,878 profit from the condominium conversion. All of the 25-percent general partnership distributive share of the interest income ($48), as well as the condominium sales profit ($226,470) was allocated to DRC (in arriving at the total of $226,518). Neither side has discussed the status of this interest item. We conclude that both sides are willing to have this interest item disposed of the same way as the condominium sales profit item, i.e., all to Cottle or all to DRC.

[24]The parties stipulated that Cottle sold the Four-Plexes "shortly after the expiration of the one-year holding period for capital gain purposes". We note that, for 1977, the holding period for long-term capital gains was changed from 6 months to 9 months. The 1-year holding period did not apply until 1978. See secs. 1402(a), 1402(b)(1)(R), and 1402(b)(2) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1731, 1732.

Respondent maintains that this transaction was the first of a series of transactions in which Cottle bought property with the intention of making various improvements thereto and then selling the property at a substantial gain after satisfying the holding period requirement for long-term capital gain treatment. Respondent contends that, because Cottle held the Four-Plexes primarily for sale to customers in the ordinary course of his trade or business, all gain from the sales of the Four-Plexes is ordinary income.

We agree with petitioners.

Section 1202[25] provides favorable tax treatment[26] for a long-term capital gain which, for 1977, was defined in section 1222(3)[27] as gain from the sale or exchange of a capital asset held for more than 9 months. Section 1221 defines the term "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)", but excludes certain types of property from capital asset status. The first two statutory exceptions are as follows:

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

In 1977, Cottle received rental income from the Four-Plexes. Cottle claimed (and respondent allowed) depreciation deductions, as provided for in section 167, for that year. We conclude that the Four-Plexes were used in Cottle's trade or business of renting apartments. The land upon which the apartment buildings stood was real property used in this

[25]The subsequent repeal of this provision by sec. 301(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2216, does not affect the instant case.

[26]For 1977, noncorporate taxpayers were permitted to deduct 50 percent of their net capital gain. This amount was then treated as an item of tax preference (sec. 57(a)(9)) and subjected to the minimum tax (sec. 55). That is how petitioners reported on their tax return Cottle's sales of the Four-Plexes. All of petitioners' reported tax preference income consisted of the sec. 1202 long-term capital gain deduction from this transaction, reduced slightly because of a small, long-term capital loss. Since respondent determined that Cottle's gain on the sale of the Four-Plexes is ordinary income, this eliminated petitioners' long-term capital gain, petitioners' sec. 1202 deduction, and petitioners' minimum tax.

[27]The subsequent amendment of this provision by sec. 1001(a)(1) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 1011, does not affect the instant case.

trade or business. Consequently, under section 1221(2), the Four-Plexes were not capital assets when Cottle sold them.

However, as relevant herein, section 1231(a) [28] provides long-term capital gain treatment to the extent gains exceed losses from sales or exchanges of "property used in the trade or business". Petitioners did not have any section 1231 losses. Therefore, to the extent the Four-Plexes are assets to which section 1231 applies, Cottle's gains on the sales of the Four-Plexes will be treated as long-term capital gains. Section 1231(b)(1)(B)[29] provides that, for purposes of section 1231, "property used in the trade or business" does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business". Petitioners have the burden of proving that the Four-Plexes were eligible for capital gain treatment, contrary to respondent's determination. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a).[30] Also, the capital gain provisions, being an exception to the normal tax rates, are to be construed narrowly. *Commissioner v. P.G. Lake, Inc.*,

---

[28]Sec. 1231(a) provides, in pertinent part, as follows:

SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business * * * exceed the recognized losses from such sales [or] exchanges * * * such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 9 months. * * *

[The subsequent amendments of this provision (by secs. 711(c)(2)(A)(iii) and 1001(b)(15) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 944, 1012) do not affect the instant case.]

[29]Sec. 1231(b)(1) provides, in pertinent part, as follows:

SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

   (1) GENERAL RULE.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 9 months, and real property used in the trade or business, held for more than 9 months, which is not—

   *       *       *       *       *       *       *

      (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or

[The subsequent amendments of this provision (by sec. 701(ee) of the Revenue Act of 1978, Pub. L. 95-600, 95 Stat. 2763, 2924, and by secs. 711(c)(2)(A)(iii) and 1001(b)(15) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 944, 1012) do not apply to the instant case.]

[30]Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

356 U.S. 260, 265 (1958); *Corn Products Co. v. Commissioner*, 350 U.S. 46, 52 (1955).

In *Malat v. Riddell*, 383 U.S. 569, 572 (1966), the Supreme Court concluded as follows:

The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand * * * and "the realization of appreciation in value accrued over a substantial period of time" on the other. * * * A literal reading of the statute is consistent with this legislative purpose. We hold that, as used in sec. 1221(1),[31] "primarily" means "of first importance" or "principally." [Citations omitted.]

Since the Congress chose to use the same language in two provisions in the same subchapter (subchapter P — Capital Gains and Losses), and nothing in the legislative history causes us to believe that the Congress intended these provisions to have different meanings, we conclude that section 1231(b)(1)(B) has the same meaning as the identical language at the end of section 1221(1) (see, e.g., *Zuanich v. Commissioner*, 77 T.C. 428, 442-443 (1981)), and we consider cases interpreting the latter provision to be authority on the former provision as well.

We have held that it is a question of fact as to whether the income in issue arose (1) from the sale of property held primarily for sale to customers in the ordinary course of the taxpayer's trade or business or (2) from the sale of property held primarily for another purpose.[32] *Daugherty v. Commissioner*, 78 T.C. 623, 628 (1982); *Bauschard v. Commissioner*, 31 T.C. 910, 915 (1959), affd. 279 F.2d 115, 117 (6th Cir. 1960). In making this determination, we must consider not only whether petitioner held the property primarily for sale to customers, but also whether the property was for sale in

---

[31]The language of subparagraph (B) of sec. 1231(b)(1), which we consider in the instant case, is identical to the language of sec. 1221(1) construed in *Malat v. Riddell*, 383 U.S. 569 (1966).

[32]However, we note that the Courts of Appeals for the Fourth and Ninth Circuits, to which this case is appealable (sec. 7482(b)(1)(A)), have ruled variously on this point. Compare *Redwood Empire S & L Ass'n v. Commissioner*, 628 F.2d 516, 518 n. 3 (9th Cir. 1980) (clearly erroneous rule), affg. 68 T.C. 960 (1977), and *Parkside, Inc. v. Commissioner*, 571 F.2d 1092-1094, 1095 (9th Cir. 1977) (question of fact mixed with law), revg. T.C. Memo. 1975-14, with *Turner v. Commissioner*, 540 F.2d 1249, 1252 (4th Cir. 1976) (clearly erroneous standard of review applies to subordinate facts, but ultimate conclusion to be drawn therefrom constitutes a question of law), revg. T.C. Memo. 1974-264. See *Daugherty v. Commissioner*, 78 T.C. 623, 628-629 (1982). See also *Byram v. United States*, 705 F.2d 1418, 1421 nn. 4 & 5 (5th Cir. 1983), discussing the position of the Courts of Appeals of several other circuits on this point.

the ordinary course of petitioner's trade or business. *Buono v. Commissioner*, 74 T.C. 187, 199-200 (1980); *Howell v. Commissioner*, 57 T.C. 546, 555 (1972), and cases cited therein. In many cases, the parties' dispute is about whether or not the taxpayer was in a trade or business. In the instant case, it is clear that Cottle was in a trade or business and that he held the Four-Plexes in that trade or business. In the instant case, then, the dispute is whether Cottle's primary purpose was to hold the property for sale to customers in the ordinary course of his trade or business or whether Cottle's primary purpose was to hold the property for some other business reason.

The purpose for which a taxpayer holds property at a particular time is, of course, subject to change. But generally it is the purpose for which property is held *at the time of sale* that determines tax treatment. *Daugherty v. Commissioner*, 78 T.C. at 629; *Biedermann v. Commissioner*, 68 T.C. 1, 11 (1977). Although this purpose is determinative, we may consider earlier events to decide what the purpose was at the time of the sale. *Daugherty v. Commissioner*, 78 T.C. at 629; *Maddux Construction Co. v. Commissioner*, 54 T.C. 1278, 1285 (1970).

To decide whether particular property is held for sale to customers in the ordinary course of the taxpayer's trade or business, courts have considered the following factors:

(1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. * * * [*United States v. Winthrop*, 417 F.2d 905, 910 (5th Cir. 1969).]

See also *Major Realty Corp. and Subsidiaries v. Commissioner*, 749 F.2d 1483, 1488 (11th Cir. 1985), affg. and revg. on another issue a Memorandum Opinion of this Court;[33] *Daugherty v. Commissioner*, 78 T.C. at 629. Other factors are often considered when they may be of aid in resolving the issue. The relative amounts of income from the taxpay-

---

[33]T.C. Memo. 1981-361.

er's regular business and from the property transaction in question can be significant in certain cases. *Real Estate Corp. v. Commissioner*, 35 T.C. 610, 613-614 (1961), affd. 301 F.2d 423 (10th Cir. 1962). The foregoing factors have no independent significance; they are merely factors to help us decide, on the basis of the record as a whole, whether Cottle held the Four-Plexes primarily for sale to customers in the ordinary course of his trade or business in 1977. *United States v. Winthrop*, 417 F.2d at 910; *Bauschard v. Commissioner*, 279 F.2d at 118; *Daugherty v. Commissioner*, 78 T.C. at 629.

As we pointed out in *S&H, Inc. v. Commissioner*, 78 T.C. 234, 244 (1982), this Court's position is that there is no—

"one-bite" rule, such that a taxpayer who engaged only in one venture or one sale cannot under any circumstances be held to be in a trade or business as to that venture or sale. * * * [Fn. ref. omitted.]

To the same effect is *Morley v. Commissioner*, 87 T.C. 1206, 1211 (1986). Finally, we reject the "one-bite" rule regardless of who seeks to invoke it;[34] although, of course, the burden of proof would affect the outcome if the record would not permit us to decide the case on a preponderance of the evidence. Cf. *Deskins v. Commissioner*, 87 T.C. 305, 322 n. 17 (1986).

On the record in the instant case, the most convincing elements are Cottle's purpose for which he bought the Four-Plexes, his use of the Four-Plexes in his trade or business, and the circumstances under which he decided to sell the Four-Plexes.

Cottle acquired the Four-Plexes as part of a plan to acquire, renovate and refurbish, and operate rental properties. The renovation and refurbishing was not to enhance salability, but to enhance rentability. Cottle sold when conditions changed, but only after he had lost the control he believed he needed in order to manage the rental operations. Even then he was the last of the original purchasers to sell. Cottle's sales efforts were trivial. We conclude that Cottle's sale of the Four-Plexes was the last step in liquidation of a rental venture that had not

---

[34]In *S and H, Inc. v. Commissioner*, 78 T.C. 234 (1982), respondent opposed the "one-bite" rule; we held for respondent. In *Morley v. Commissioner*, 87 T.C. 1206 (1986), respondent favored the "one-bite" rule; we held for the taxpayer.

developed in accordance with Cottle's plans. Cottle held the Four-Plexes primarily for use in his trade or business of renting apartments (although this venture was his "first bite" in that field, clearly this venture was a trade or business) and this trade or business did not have as any of its aspects the sale of the apartments.

We conclude that Cottle did not hold the Four-Plexes primarily for sale to customers in the ordinary course of any trade or business in which he was engaged.

As to the listed factors, we note the following: (1) For the nature and purpose of Cottle's acquisition of the Four-Plexes, see the second preceding paragraph, he held the Four-Plexes just over 12 months (about 3½ months longer than the then-applicable minimum long-term capital gain holding period); (2) Cottle did not have to advertise or engage in sales promotional activities to sell the Four-Plexes; (3) the 3 Four-Plexes were the only properties Cottle sold in this trade or business; and (4) through (7) the renovation and refurbishing were not undertaken primarily to increase sales, but rather to enhance rentability of the Four-Plexes, and petitioner did not engage in any significant sales activities.

On brief, respondent asserts as follows:

According to petitioner's testimony at trial, these properties [the Four-Plexes] were the first in a chain of frequent and continuous transactions by which petitioner bought property, improved the property, and sold the property at a gain. These other transactions involved properties located at Incline Village, Concord-Oak Grove, Vallejo and Lake Tahoe.

Although Cottle (or entities that he controlled) subsequently acquired real estate that was held with the intention of developing the properties for resale (i.e., primarily for sale in the ordinary course of his trade or business), we do not believe that this evidences that Cottle changed his purpose in holding the Four-Plexes. It is well established that a taxpayer may be engaged in more than one trade or business, see *S&H, Inc. v. Commissioner*, 78 T.C. at 243, and that a taxpayer in the real estate business may hold real estate as an investment, *Maddux Construction Co. v. Commissioner*, 54 T.C. at 1286. To the extent that Cottle personally acquired additional real property that he in-

tended to rehabilitate and then resell, we believe this can be viewed in either of two ways. First, Cottle can be viewed as having enlarged or modified his trade or business to include the rehabilitation and sale of improved real estate. Alternatively, Cottle can be viewed as having entered into a new trade or business with respect to these subsequent acquisitions. *S&H, Inc. v. Commissioner*, 78 T.C. at 243. However, neither of these views, which results in Cottle's holding the later acquired real property primarily for sale in the ordinary course, altered his purpose in holding the Four-Plexes primarily for rental purposes.

We are convinced, from the record in the instant case, that Cottle sold to liquidate his rental business and not because holding for sale to customers had become the ordinary course of the business in which he held the Four-Plexes.

Respondent's position is epitomized by the concluding paragraph of his opening brief's analysis of this issue, as follows:

Mr. Cottle was not a passive investor in the Daly City project. His devotion of 60 hours a week to the project and the large gain resulting therefrom in a very short period of time demonstrates that Mr. Cottle's trade or business during this period was improving the four-plexes for resale. A taxpayer's active role in real estate transactions, as opposed to a passive role, is evidence of the transactions being a business activity. *Nadalin v. United States*, 364 F.2d 431 (Ct. Cl. 1966), 66-2 U.S.T.C. par. 9548.

Respondent has missed the critical distinction. The instant case does not present, in this issue, the dichotomy of passive investment versus active trade or business. Cottle was clearly in a trade or business, and was clearly active in that trade or business. The dichotomy is, rather, holding primarily for rental versus holding primarily for sale—in the ordinary course of the trade or business.

We conclude that Cottle held the Four-Plexes primarily for rental and not primarily for sale in the ordinary course of his trade or business.

We hold for petitioners on this issue.[35]

---

[35]This, however, reinstates petitioners' minimum tax. See note 26 *supra*; *Yamamoto v. Commissioner*, 73 T.C. 946, 962 (1980), affd. without published opinion 672 F.2d 924 (9th Cir. 1982).

## II. Concord-Oak Grove Associates

Both sides agree that the income from the sales of the condominium units in 1977 was earned by Associates in 1977 and reportable by Associates for that year. Also, there is no dispute as to how much of this income is allocable to the 25-percent general partnership interest originally held by Cottle, but which was transferred to DRC, on October 21, 1977, several weeks before the first closing of the condominium units.

Respondent contends that Cottle should be taxed on all of Associates' 1977 income that is allocable to the 25-percent interest because Associates had performed "the vast majority of the acts necessary to earn the income" from the condominium sales by October 21, 1977, the date on which Cottle transferred his general partnership interest in Associates to DRC.[36] The basic question, respondent contends, is who (as between Cottle and DRC) earned the income and not when was the income earned.

Petitioners answer that there is no dispute about who earned the income—the income was earned by Associates. The question, rather, is who is to be taxed on 25 percent of the income. Petitioners contend that (1) under the statute and the regulations this matter may be resolved by use of the interim closing of the books method, (2) under this method there was no income to be recognized by the partnership on October 21, 1977, and (3) therefore there is no income to allocate to Cottle's ownership of the 25-percent general partnership interest in Associates.

Respondent replies that the statutory and regulatory schemes merely require that the allocation take into account the partner's "varying interests in the partnership during the taxable year." Respondent asserts that "the interim closing of the books was not a reasonable method of determining who should report the income in question."

Neither side would accept a proration method.[37]

---

[36]Respondent's counsel put it this way at trial: "Without the acts that were performed before October 21st, the income as a whole cannot be earned, so we say that all of the income should be treated as having been earned by Petitioner, Donald R. Cottle, by October 21st, '77. The income was ready and waiting to be picked off the tree, so to speak."

[37]Neither side disagreed with the Court's attempt at trial to summarize the parties' positions, immediately after the parties' opening statements, as follows:

We agree with petitioners.

Section 702(a) requires each partner to report that partner's "distributive share" of the partnership's taxable income, gains, losses, deductions, and credits. Section 704(a) provides that a partner's distributive share of these items is to be determined by the "partnership agreement",[38] except as otherwise provided in chapter 1 (relating to normal taxes and surtaxes). Section 704(b) provides that, if either (1) the partnership agreement does not have an allocation rule or (2) the partnership agreement's allocation rule does not have substantial economic effect, then the partner's distributive share is to be determined in accordance with the partner's interest in the partnership. In the instant case, both sides agree that 25 percent of Associates' income is the correct distributive share of the 25-percent interest in question.

Section 706(a) provides that, in computing the taxable income of a partner for a taxable year, the inclusions required by section 702 are to be based on the income, gain, loss, deduction, or credit of the partnership for any taxable year of the partnership ending within or with the taxable year of the partner.

Section 706(c)[39] provides rules for situations where a

---

"Then both sides are taking the position, or rather each side is taking the position that all of the income from that share of the partnership [Associates] swings either to Mr. Cottle or to the corporation [DRC] and that there is no basis for making a determination that such and such an amount of income had been earned by that date [Oct. 21, 1977] and some remaining amount of income was yet to be earned."

[38]A partnership agreement includes any modifications made to the agreement prior to or at the time prescribed by law for filing the partnership return. Sec. 761(c).

[39]Sec. 706(c) provides, in pertinent part, as follows:

SEC. 706. TAXABLE YEARS OF PARTNER AND PARTNERSHIP.

(c) CLOSING OF PARTNERSHIP YEAR.—

(1) GENERAL RULE.—Except in the case of a termination of a partnership and except as provided in paragraph (2) of this subsection, the taxable year of a partnership shall not close as the result of the death of a partner, the entry of a new partner, the liquidation of a partner's interest in the partnership, or the sale or exchange of a partner's interest in the partnership.

(2) PARTNER WHO RETIRES OR SELLS INTEREST IN PARTNERSHIP.—

(A) DISPOSITION OF ENTIRE INTEREST.—The taxable year of a partnership shall close—

(i) with respect to a partner who sells or exchanges his entire interest in a partnership, and * * *.

Such partner's distributive share of items described in section 702(a) for such year shall be determined, under regulations prescribed by the Secretary, for the period ending with such sale, exchange, or liquidation.

(B) DISPOSITION OF LESS THAN ENTIRE INTEREST.—The taxable year of a partnership shall not close (other than at the end of a partnership's taxable year as determined under subsection (b)(1)) with respect to a partner who sells or exchanges less than his entire interest in the partnership or with respect to a partner whose interest is reduced (whether by entry of a new partner, partial liquidation of a partner's interest, gift, or

partner's interest in the partnership changes during thepartnership's taxable year. Under the general rule of paragraph (1) of section 706(c), Associates' taxable year does not close because of Cottle's transfer of his general partnership interest to DRC. Under paragraph (2)(A)(i), if Cottle had transferred his entire interest in Associates, then Associates' taxable year would close, but only as to Cottle. Under paragraph (2)(B), since Cottle retained his 1-percent limited partnership interest in Associates, Associates' taxable year does not close (even as to Cottle) but Cottle's distributive share of Associates' income, etc., is to be determined by taking into account Cottle's varying interests in Associates during 1977.

The statute does not prescribe how we are to take Cottle's varying partnership interests into account. Section 1.706-1(c)(4), Income Tax Regs.,[40] essentially tracks the statute and does not provide any additional guidance.

The last amendment to these statutory provisions before the year in issue was made by section 213(c)(1) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1547, which inserted in section 706(c)(2)(B) the parenthetical "(whether by entry of a new partner, partial liquidation of a partner's interest, gift, or otherwise)".

The congressional reports accompanying this amendment direct that regulations be adopted—

to apply the same alternative methods of computing allocations of income and loss to situations falling under section 706(c)(2)(B) as those now applicable to section 706(c)(2)(A) situations (sale or liquidation of an entire interest). These rules will permit a partnership to choose the easier method of prorating items according to the portion of the year for which a partner was a partner or the more precise method of an interim closing of books (as if the year had closed) which, in some instances, will be more

---

otherwise), but such partner's distributive share of items described in section 702(a) shall be determined by taking into account his varying interest in the partnership during the taxable year.

[The subsequent amendments of this provision by sec. 72 of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 589, do not apply to the instant case.]

[40]Sec. 1.706-1. Taxable years of partner and partnership.

(c) *Closing of partnership year—* * * *

(4) *Disposition of less than entire interest.* If a partner sells or exchanges a part of his interest in a partnership, or if the interest of a partner is reduced, the partnership taxable year shall continue to its normal end. In such case, the partner's distributive share of items which he is required to include in his taxable income under the provisions of section 702(a) shall be determined by taking into account his varying interests in the partnership during the partnership taxable year in which such sale, exchange, or reduction of interest occurred.

advantageous where most of the deductible expenses were paid or incurred upon or subsequent to the entry of the new partners to the partnership.

S. Rept. 94-938, at 98 (1976), 1976-3 C.B. (Vol. 3) 49, 136. See H. Rept. 94-658, at 124-125 (1975), 1976-3 C.B. (Vol. 2) 695, 816. See also Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, at 93-94 (1976), 1976-3 C.B. (Vol. 2) 1, 105-106. Such regulations have not yet been adopted.

In *Richardson v. Commissioner*, 76 T.C. 512, 525-526 (1981), affd. 693 F.2d 1189 (5th Cir. 1982), we concluded that a taxpayer who transferred a partial partnership interest may rely on the regulations under section 706(c)(2)(A),[41] which address the method of allocation on the sale or exchange of a partner's entire interest in the partnership. Specifically, we concluded that the taxpayer "may use an interim closing of the books method, allocation

---

[41]Sec. 1.706-1(c)(2)(ii), Income Tax Regs., provides as follows:

Sec. 1.706-1. *Taxable years of partner and partnership.*— * * *
  (c) *Closing of partnership year*— * * *
  (2) *Partner who retires or sells interest in partnership*—

  \*      \*      \*      \*      \*      \*      \*

  (ii) *Inclusions in taxable income.*—In the case of a sale, exchange, or liquidation of a partner's entire interest in a partnership, the partner shall include in his taxable income for his taxable year within or with which his membership in the partnership ends, his distributive share of items described in section 702(a), and any guaranteed payments under section 707(c), for his partnership taxable year ending with the date of such sale, exchange, or liquidation. In order to avoid an interim closing of the partnership books, such partner's distributive share of items described in section 702(a) may, by agreement among the partners, be estimated by taking his pro rata part of the amount of such items he would have included in his taxable income had he remained a partner until the end of the partnership taxable year. The proration may be based on the portion of the taxable year that has elapsed prior to the sale, exchange, or liquidation, or may be determined under any other method that is reasonable. Any partner who is the transferee of such partner's interest shall include in his taxable income, as his distributive share of items described in section 702(a) with respect to the acquired interest, the pro rata part (determined by the method used by the transferor partner) of the amount of such items he would have included had he been a partner from the beginning of the taxable year of the partnership. The application of this subdivision may be illustrated by the following example:

  *Example.* Assume that a partner selling his partnership interest on June 30, 1955, has an adjusted basis for his interest of $5,000 on that date; that his pro rata share of partnership income up to June 30 is $15,000; and that he sells his interest for $20,000. Under the provisions of section 706(c)(2), the partnership year with respect to him closes at the time of the sale. The $15,000 is includible in his income as his distributive share and, under section 705, it increases the basis of his partnership interest to $20,000, which is also the selling price of his interest. Therefore, no gain is realized on the sale of his partnership interest. The purchaser of this partnership interest shall include in his income as his distributive share his pro rata part of partnership income for the remainder of the partnership taxable year.

of yearend totals of income or loss ratably over the year, or any other reasonable method." 76 T.C. at 526.

The proration method involves computing partnership income or loss at the end of the partnership year and allocating the yearend totals ratably over the year according to the partners' percentage interests and the number of days they owned interests in the partnership. *Johnsen v. Commissioner*, 84 T.C. 344, 347 (1985), supplementing 83 T.C. 103 (1984), revd. on another issue 794 F.2d 1157 (6th Cir. 1986); *Moore v. Commissioner*, 70 T.C. 1024, 1035-1036 (1978); *Sartin v. United States*, 5 Cl. Ct. 172, 175 (1984). The interim closing of the books method requires a closing of the partnership books as of the date of entry of the new partner and the computation of the various items of partnership income, gain, loss, deduction, and credit as of that date. See *Johnsen v. Commissioner*, 84 T.C. at 347; *Moore v. Commissioner*, 70 T.C. at 1035; *Sartin v. United States*, 5 Cl. Ct. at 175. A taxpayer who elects to use the interim closing of the books method has the additional burden of establishing the date when each partnership item was paid or incurred and what receipts the partnership had during the short period. *Johnsen v. Commissioner*, 84 T.C. at 348, 349-354; *Moore v. Commissioner*, 70 T.C. at 1036; *Sartin v. United States*, 5 Cl. Ct. at 175-176. Toward this end, subchapter K dictates that the deductibility and timing of a deduction, and the includability and timing of income, are determined at the partnership level and by the method of accounting utilized by the partnership. *Richardson v. Commissioner*, 76 T.C. at 527; see also *Johnsen v. Commissioner*, 84 T.C. at 354. Of the two methods, the interim closing of the books method is the more accurate, but the proration method is simpler to apply. See *Lipke v. Commissioner*, 81 T.C. 689, 699 (1983), affd. without published opinion 751 F.2d 369 (2d Cir. 1984).

Associates used the interim closing of the books method to determine how to allocate between Cottle and DRC the 25-percent general partner's distributive share of Associates' income. As applied to the instant case, this method requires us to determine what would have been Associates' profit from the sale of the condominium units in the property if Associates had closed its books on October 21,

1977, the date when Cottle transferred his 25-percent general partnership interest to DRC. By that date, Associates had not yet earned any income from the sale of the condominium units. As of October 21, 1977, Associates merely had an option to acquire the property. This option was not exercised until November 15, 1977, the date on which the first closing occurred. Moreover, no condominium regime had yet been established on the property; nor could the condominium subdivision map be recorded pursuant to the report until there were 50 units that could be closed simultaneously. This requirement had to be satisfied by March 1, 1978. Thus, Associates had no legal right to transfer any condominium units on October 21, 1977, because it was not yet the owner of the property and there were no condominium units yet to sell. Associates had only the right to make contingent sales contracts, but not to close on any units until it could close 50 units simultaneously. The 50-unit requirement was not satisfied until November 15, 1977, by which time DRC was a substituted general partner.

On October 21, 1977, Associates had potential buyers who had signed deposit receipts with respect to 81 of the 93 condominium units. However, loans had been approved for only 36 of these potential buyers (i.e., 72 percent of the units needed to satisfy the 50-unit requirement). Any of the potential buyers, including those for whom loans had been approved, could have requested release from his or her contract before the date of the closing; Cottle and Bundy, in accordance with their established policy, would have accommodated this request. See note 17 *supra*. Thus, on the basis of the record in the instant case, we do not find that it was a virtual certainty on October 21, 1977, that the 50-unit requirement would ultimately be met. Finally, there was no certainty as of October 21, 1977, that there would be profits to be allocated to the partners because the condominium conversion could have been unsuccessful, even if the 50-unit requirement were met and the first closing occurred.[42]

---

[42]As we have found, Associates faced the following risks even after the Nov. 15, 1977, closing:

(1) Associates became the owner of the unsold units and so was liable for the monthly homeowners' dues and taxes thereon;

(2) the most desirable units had been sold and the least desirable remained to be sold;

We think that Cottle and Oddo were aware of the risks inherent in a condominium conversion and planned this undertaking so that at any point up until the first closing of the 50 units, Associates could abandon the transaction altogether. That is, Associates could decline to exercise its option to purchase the property or, even if it chose to exercise the option, Associates could decline to complete the condominium conversion by failing to record the condominium map. Thus, because it appears that there were many prerequisites to closing that had to be satisfied after October 21, 1977, we conclude that the November 15, 1977, closing was not merely a ministerial step that occurred after Associates had earned income from the condominium sales. We conclude that, as of October 21, 1977, Associates did not have any income from the sale of the condominium units. Thus, under the interim closing of the books method, there was no income from this source to allocate to Cottle, and the entire distributive share attributable to the 25-percent general partnership interest was properly allocable to DRC.

Respondent does not contend that the interim closing of the books method should lead to a different result. Rather, respondent contends that—

due to the facts of this case and due to the assignment of income doctrine, the interim closing of the books was not a reasonable method of determining who should report the income in question.

The instant case is similar to *Richardson v. Commissioner, supra*, in which the Court was faced with the question regarding the proper allocation of losses which arose from deducting expenses, the liability for which arose before the admission of new partners to a cash basis partnership, but which were paid thereafter. The new partners were admitted to three partnerships on December 30, 1974, and were given a 99-percent interest in the profits and losses of each partnership for 1974. After holding that section 706(c)(2)(B) prohibited a retroactive allocation of losses on the admission of new partners and that the varying interest rule applied, we determined the proper

(3) tenant vacancies accelerated; and

(4) lenders might be reluctant to finance potential buyers' purchases if Associates could not guarantee that 80 percent of the units not only would .be sold but would be owner-occupied.

method for allocating the losses as follows (76 T.C. at 526-527):

Respondent contends that an interim closing of the books is unreasonable in the instant case because the deductible expenses paid on December 31, 1974, represent in part expenses incurred during the January 1 to December 30, 1974, period and therefore cannot properly be allocated to the new partners. * * *
   Respondent's position is set forth in his brief as follows:

The basis for respondent's contention is that, if instead of purchasing an interest in the partnership that owns property that generates deductible expenses, the taxpayer purchases a direct individual interest in the property itself, the taxpayer would not be permitted to deduct the expenses to the extent that they were incurred and sustained prior to the purchase. Respondent contends that a taxpayer should not be permitted to use an end of the year acquisition of an interest in a partnership to obtain deductions that he could not obtain if he had purchased an undivided interest in the property itself.

Thereafter, respondent cites a number of cases that stand for the proposition that the purchaser's assumption of a deductible expense of the seller, which accrued prior to the time of the acquisition of the property, constitutes a capital expense of the purchaser and not a deductible expense.
   We believe the respondent's position is without merit. It is well recognized that subchapter K dictates that the deductibility and timing of a deduction is determined at the partnership level and by the method of accounting utilized by the partnership. W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 9.02[1], pp. 9-5 to 9-7 (1977). Respondent has conceded that the expenses here in issue were all ordinary and necessary business expenses of the partnerships for their tax years ended December 31, 1974. The record clearly established that each of the partnerships was in financial trouble and suffered from a severe cash-flow problem. The utility bills of the apartment complexes were in arrears and the mortgage company was considering foreclosure proceedings. The contributions of the new partners were utilized to reduce the cash-flow problems and to pay the outstanding expenses of the partnerships. While the partnerships are the trees which grew the fruit, it was the new partners' contributions which ripened the fruit to deductibility. Since the partnerships utilized the cash method of accounting and the allocation of the losses occurring on December 31, 1974, to the new partners was reasonable and reflected economic reality, we find that petitioners may utilize the interim closing of the books method for the purposes of allocating the partnerships' losses.

Respondent acknowledges the existence of *Richardson v. Commissioner*, but ignores our explanation therein, "that subchapter K dictates that the deductibility and timing of a

deduction is determined at the partnership level and by the method of accounting utilized by the partnership. W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 9.02[1], pp. 9-5 to 9-7 (1977)." As we see it, the *Richardson* formulation applies equally to income, and the timing of the income is determined at Associates' level and by Associates' method of accounting. Under the *Richardson* formulation, Associates did not have any income as of October 21, 1977, that could have been allocated to Cottle. Thus, under *Richardson*, we do not look to what would have been the case if Cottle had transferred business assets or a going business to DRC. Rather, we first determine at the partnership level both the amount *and the timing of the income*. We have found that there was no income during Cottle's ownership of the 25-percent general partnership interest, and that Associates chose the interim closing of the books method to determine Cottle's distributive share as to that interest. It follows that Cottle's distributive share as to that interest is zero.

Respondent argues that the principles of *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945), as applied in *Murry v. Commissioner*, T.C. Memo. 1984-670, should govern the instant case to cause petitioners rather than DRC to be taxable on the profits from the condominium sales.

In *Murry*, the taxpayer owned an apartment complex that was to be converted to a condominium, and the units therein would subsequently be sold. The taxpayer's wholly-owned corporation was to undertake the development of the property as a condominium. Because of certain financial difficulties, the taxpayer had to sell the apartment complex to the lender. However, in order to accommodate the taxpayer's tax considerations, the lender agreed to buy the property from the taxpayer's corporation. The taxpayer thus agreed to make a capital contribution of the property to the corporation, if the corporation agreed to sell the property immediately thereafter to the lenders.

We held in *Murry* that the taxpayer and not the corporation was taxable on the sale of the property to the lender. In so holding, we applied the *Court Holding* doctrine which provides that "A sale by one person cannot be

transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." *Commissioner v. Court Holding Co.*, 324 U.S. at 334.

We agree with petitioners that *Murry* is not relevant to this case. Associates in the instant case was the owner and developer of the property. It converted the property to condominium units, sold the units therein, and reported the profits from these sales on its partnership return. There is no question in this case, as was present in *Murry*, as to who earned the income. No conduit was used by Associates to sell the condominium units. The parties agree that Associates earned the income; the only question in the instant case is how that income is to be allocated among the partners. And that question is resolved solely by application of section 706(c)(2)(B), which governs the allocation of partnership items when there are transfers of partial partnership interests during the tax year. The rules thereunder are specifically designed to avoid assignments of income and retroactive allocation of losses between transferor and transferee partners. *Moore v. Commissioner*, 70 T.C. at 1032-1033. We think they adequately resolve the question in the instant case, and that their use is specifically mandated by *Richardson v. Commissioner*, 76 T.C. at 526-527.

We hold for petitioners on this issue.[43]

We have held for petitioners on both of the issues presented for decision;[44] in order to take account of petitioners' concessions on other matters,

*Decision will be entered under Rule 155.*

---

[43]We express no position as to what would have been the result if Associates had used the pro rata method, or if respondent had determined that the pro rata method should have been used. See note 37 *supra*; *Estate of Fusz v. Commissioner*, 46 T.C. 214, 215 n. 2 (1966).

[44]In the notice of deficiency, respondent determined that all of the $226,518 is ordinary income to Cottle. The parties' dispute focuses on whose income it is, and not on what kind of income it is. Because of our conclusion, we do not have to determine what kind of income it is.

As we have found, petitioners reported their limited partner shares of the profits as short-term capital gains, and not as ordinary income. It appears that petitioners' tax liability would be greater if the limited partner shares were ordinary income rather than short-term capital gains. Respondent has not disturbed petitioners' treatment of their limited partner shares. We leave the parties as we find them on this point.

Also, see note 23 *supra*, with regard to a small amount of interest income.