T.C. Memo. 1998-302


UNITED STATES TAX COURT


NEAL T. BAKER ENTERPRISES, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20372-95.                    Filed August 19, 1998.


<u>John K. Mirau</u>, for petitioner.

<u>Lisa Kuo</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WRIGHT, <u>Judge</u>: Respondent determined a deficiency in
petitioner's Federal income tax for the tax year ended March 31,
1990 (1989 taxable year), in the amount of $145,794.

This case involves the question of whether petitioner may
defer recognition of gain from the disposition of certain real

property under section 1031.[1]  More specifically, we must decide whether petitioner held the exchanged real property primarily for sale so that the gain is taxable in the 1989 taxable year.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein.  Petitioner's principal office was located in San Bernardino, California, at the time it filed its petition. Petitioner filed a U.S. Corporation Income Tax Return, Form 1120, for the taxable year 1989, with the Director, Internal Revenue Service Center, Fresno, California.  Petitioner used a fiscal year ending March 31.

Petitioner was incorporated on September 18, 1957, under the laws of the State of California.  From petitioner's inception to the taxable year 1991, Neal T. Baker (Mr. Baker), as president and director of petitioner,[2] controlled and directed its operations.  Additionally, starting in 1987, Mr. Baker was petitioner's chief financial officer.  During the period from

---

[1]  All section references are to the Internal Revenue Code in effect for the year at issue, unless otherwise indicated.  All Rule references are to the Tax Court Rules of Practice and Procedure.

[2]  At times during the period 1978 to 1991, Neal T. Baker also served as treasurer and secretary of petitioner.
Besides his role with petitioner, Mr. Baker was a charter member of the Business Bank of California.  As a chairman of the bank's loan committee, Mr. Baker reviewed construction loans.

1978 to 1991, Carol Baker served as petitioner's vice president and director.[3] At times during the period from 1978 to 1991, one other person served in the position of treasurer, secretary, chief financial officer, or director.

Petitioner's articles of incorporation, filed September 13, 1957, listed the following purposes:

(a) PRIMARY PURPOSE--To operate drive-in restaurants, SECONDARY PURPOSE--To construct and sell buildings and,
(b) To manufacture, fabricate, assemble, to take, purchase and otherwise acquire, own, hold, use, sell, assign, transfer, exchange, lease, and otherwise dispose of, and to invest, trade, deal in and with goods, wares and merchandise and supplies and all other personal property of every class and description.
(c) To purchase, acquire, own, hold, use, lease (either as lessor or lessee), grant, sell, exchange, subdivide, mortgage, convey in trust, manage, improve, construct, operate and generally deal in any and all real estate, improved or unimproved, stores, office buildings, dwelling houses, apartment houses, hotels, manufacturing plants and other buildings, and any and all other property of every kind or description, real, personal and mixed, and wheresoever situated, either in California, other states of the United States, or foreign countries.

                    *    *    *    *    *    *    *

In 1969, petitioner engaged in a corporate restructuring in which Baker's Burger was incorporated to conduct petitioner's fast-food business. According to the minutes of the special meeting of the Board of Directors on October 16, 1969:

The Chairman [Mr. Baker] explained that Baker's Burgers, Inc., a California corporation, was formed to conduct the drive-in hamburger and Taco Stand business separate and apart from the contracting business, both of which were

---

[3] Carol Baker was also petitioner's secretary in 1978, 1979, and 1980.

formerly carried on by Neal T. Baker Enterprises. He further stated that the two businesses were for all practical purposes totally unrelated, and that it had become necessary to conduct the two businesses separately in order to facilitate flexibility, expansion, cost control, proper management and the raising of capital.

Mr. Baker testified that the restructuring was in part to prepare Baker's Burgers, Inc., for a possible public offering. Petitioner transferred assets (valued at $36,000) to Baker's Burgers, Inc., in exchange for stock of Baker's Burgers, Inc. As a result of the restructuring, petitioner held real estate holdings, which included buildings for fast-food locations (which were leased to Baker's Burger, Inc.), real estate held for investment, and real estate held for development. After 1969, petitioner continued to construct additional fast-food locations, and also continued to contract with third parties for the construction of residential properties.

In regard to its construction operations, petitioner had a contractor's license with the State of California, but it did not have any contracting equipment. All the contracting work was done through subcontractors. Petitioner recorded the work done (payments) by its subcontractors under work-in-progress/construction in-progress accounts. Petitioner used realtors to sell its properties. Petitioner recognized revenue from these sales when escrow closed.

On February 1, 1983, petitioner filed its restated articles of incorporation with the State of California, providing the

purpose "to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code."

Beaumont Property--Tract No. 10018

On March 10, 1978, petitioner purchased from the Simoffs vacant land in Beaumont, California (Beaumont Property), for $155,000. Beaumont Property is bounded on the west by Pennsylvania Avenue, the east by Cherry Avenue, the south by 10th Street, and the north by another lot north of 11th Street. When petitioner purchased the Beaumont Property, the property was zoned R-1 for single-family residential use. Petitioner never made an application to have the Beaumont Property rezoned to R-4 multi-family residential use.

From 1978 through 1989, petitioner hired three engineering firms to process tentative maps on the Beaumont Property: (1) H. D. Marcell; (2) Wes Engineering; and (3) Garner, Troy & Associates, Inc.

Petitioner's purchase of the Beaumont Property was contingent upon the Tentative Subdivision Map being approved by the City of Beaumont Planning Commission (Planning Commission). At that time, there was a subdivision map prepared by H. D. Marcell for the Simoffs. This tentative map proposed to

subdivide the property into 48 lots for the construction of single-family residential houses.  On June 22, 1978, the tentative subdivision map was approved by the Planning Commission.  The map was assigned Tract No. 10018.

On April 23, 1979, petitioner's Board of Directors authorized the preparation and filing of an application to the Real Estate Commissioner of the State of California for a Public Report in connection with the subdivision and sale of real property on the 48 lots of the Beaumont Property.

Later, petitioner hired Wes Engineering to prepare a revised tentative map for Tract No. 10018.  The map proposed 56 single-family residential lots, and was resubmitted to the city of Beaumont on February 28, 1980.  In July 1980, the new tentative map was approved by the Planning Commission.  On July 9, 1980, Wes Engineering prepared and executed a rough grading plan for Tract No. 10018, which was approved by the city of Beaumont on March 16, 1981.

In regard to the entire Beaumont Property in 1981, the city of Beaumont required a bond of $365,000 to be posted to guarantee construction of street improvements and sewer improvements.

In early 1981, the city of Beaumont contracted with CG Engineering to design and prepare improvement plans for Pennsylvania Avenue.  During 1981 and 1982, the city of Beaumont

built street improvements on Pennsylvania Avenue.  This construction was funded by the city of Beaumont.

14 Lots Fronting Pennsylvania Avenue--Tract No. 10018-1

In 1981, petitioner subcontracted with Matich Corporation to construct curbs, gutters, sidewalks, water service, waterline and gate valves, and fire hydrants relating to the 14 lots along Pennsylvania Avenue.  Petitioner paid $23,874.35 for this work.

In 1982, petitioner applied for a 1-year extension, which was approved by the city of Beaumont, of its tentative map Tract No. 10018.  In mid-1983, petitioner submitted a request to record a final map for Tract No. 10018-1 to the city of Beaumont.  Tract No. 10018-1 pertained to the portion (14 lots) of Beaumont Property fronting Pennsylvania Avenue.  On September 20, 1983, the Planning Commission conditionally approved petitioner's phasing for Tract No. 10018-1.  On December 12, 1983, petitioner and the city of Beaumont entered into an agreement for subdivision improvements on Tract No. 10018-1.  The final map for Tract No. 10018-1 was recorded on December 20, 1983, creating 14 lots along Pennsylvania Avenue.

In 1984, petitioner contracted with Michael C. Mize to install 8-inch sewer laterals for the 14 lots along Pennsylvania Avenue, at a total cost of $22,500.00.

On or about October 1986, petitioner contracted for the construction of 14 single family residences in Tract No. 10018-1.

Petitioner entered into contracts with subcontractors, who built the residences.  The 14 houses were constructed in two phases, the first phase of 6 houses (construction commenced on October 17, 1986) and the second phase of 8 homes (construction commenced on June 25, 1987).  Petitioner sold the 14 homes from July 21, 1987, through March 31, 1989, as follows:

| Date of Sale | Address | Selling Price |
|---|---|---|
| 07/21/87 | 1202 E. 10th Street | $79,950 |
| 09/30/87 | 1050 Pennsylvania Avenue | 87,950 |
| 12/22/87 | 1070 Pennsylvania Avenue | 77,950 |
| 01/08/88 | 1090 Pennsylvania Avenue | 87,950 |
| 09/16/88 | 1010 Pennsylvania Avenue | 89,500 |
| 09/23/88 | 1110 Pennsylvania Avenue | 77,950 |
| 11/17/88 | 1202 E. 11th Street | 79,950 |
| 11/22/88 | 1201 E. 11th Street | 77,550 |
| 01/27/89 | 1130 Pennsylvania Avenue | 80,950 |
| 02/10/89 | 1120 Pennsylvania Avenue | 89,950 |
| 02/28/89 | 1030 Pennsylvania Avenue | 77,000 |
| 03/06/89 | 1100 Pennsylvania Avenue | 87,950 |
| 03/13/89 | 1140 Pennsylvania Avenue | 89,950 |
| 03/31/89 | 1150 Pennsylvania Avenue | 89,950 |

Petitioner classified the cost of the 14 houses on the Beaumont Property under cost of houses sold, and classified income from their sale as ordinary income.

Exchange Property--Tract No. 22332

The tentative map for Tract No. 10018 expired in 1983. In regard to the remaining 48 lots of the Beaumont Property (hereinafter referred to as the Exchange Property[4]) in Tract No. 10018, petitioner resubmitted a tentative map in March 1986.

---

[4]  Exchange Property is the Beaumont Property minus the 14 lots created by the final map of Tract No. 10018-1.

In March 1986, petitioner prepared a Parcel Map/Tract Map Application Form and a City of Beaumont Environmental Review & Processing Application Form for the Exchange Property. During May 1986, public hearings involving the Planning Commission occurred in regard to the "proposed forty-eight (48) lot subdivision for construction of single family homes."

On May 6, 1986, the city conditionally approved the tentative map for the Exchange Property. On June 9, 1986, the city approved the tentative map for the Exchange Property, Tract No. 22332, and subsequently extended the approval of the map until June 9, 1989.

Garner, Troy & Associates prepared a draft tentative map, dated July 1987, for Tract No. 22332. Between January 1987 and May 1989, Garner, Troy & Associates prepared the final map and portions of the improvements plans for Tract No. 22332 in accordance with the conditions, as revised, imposed by the city of Beaumont.

At that time, petitioner worked with James Dotson, the engineer for the city of Beaumont, to revise the conditions on the Exchange Property. For petitioner, Mr. Dotson was able to lock-in the city's prices for its fees before the city implemented Resolution No. 1988-10.

While petitioner never obtained a feasibility study of off-site improvements regarding the Exchange Property, Garner, Troy

and Associates prepared a Quantity and Cost Estimate (Preliminary) for Tract No. 22332, dated January 16, 1987, stating costs of $389,435.81 for the Exchange Property. Later, in a Quantity and Cost Estimate (Preliminary) for Tract No. 22332, dated February 3, 1988, Garner, Troy and Associates estimated the costs were in the amount of $490,560. The Quantity and Cost Estimate was approved by Mr. Dotson for the city of Beaumont on March 18, 1988. On February 1, 1988, the city approved a grading plan for Tract No. 22332.

Petitioner made no improvements on the Exchange Property.

Exchange

In 1988, Gold Coast Development, Inc. (Gold Coast), approached petitioner with an offer of $650,000 to purchase the Exchange Property. Petitioner indicated that it was unwilling to sell the Exchange Property, but would be willing to exchange the Exchange Property. On April 5, 1989, petitioner entered into an exchange agreement with Empire Realty Exchange, Inc. (Empire). The conveyance of the Exchange Property was contingent upon the following:

(1) Petitioner's house plans being approved for construction by the city of Beaumont;
(2) Gold Coast being able to secure building permits for the houses;
(3) Gold Coast verifying with the city that all necessary approvals to enable Gold Coast to record a final subdivision map for 48 single family lots have been obtained;

(4) Securing 48 sewer permits for the project from existing treatment plant's capacity; and
(5) Securing 48 water connections.

Pursuant to the exchange agreement, Empire agreed to acquire and convey to petitioner one or more parcels of property to be designated by petitioner.  On May 16, 1989, Empire arranged for the sale of the Exchange Property to Ameriasian (successor in interest to Gold Coast) for $674,000.  A grant deed conveying the Exchange Property from petitioner to Ameriasian was recorded the same day.  Petitioner did not receive any proceeds from the sale of the Exchange Property.  Petitioner received a $584,800 exchange credit with Empire for acquiring property yet to be designated.

Pursuant to the exchange agreement, petitioner designated the following four properties to Empire, within 45 days after May 16, 1989:  (1) An undivided 7.87-percent interest in a parcel of vacant land located along Phelan Road in Phelan, California; (2) four lots with a house located along Mentone Boulevard in Mentone, California; (3) three lots with a fast-food store located along Mount Vernon in Colton, California; and (4) parcels of vacant land located along Palm Avenue in Highland, California.  All four properties were commercial properties suitable for constructing fast-food stores.  Empire purchased the four designated properties within 180 days after May 16, 1989.  Grant deeds conveying the four designated properties from the

respective sellers to petitioner were recorded within 180 days after May 16, 1989.

Development of Exchange Property by Elkhorn

Around March/April 1989, Gold Coast approached Elkhorn Development Company (Elkhorn) and proposed that they jointly build 48 houses on the Exchange Property. Elkhorn was not interested in a joint venture. Subsequently, Gold Coast offered to sell the Exchange Property to Elkhorn.

In regard to the Exchange Property, Elkhorn discussed with Robert Bounds, the city manager for Beaumont, topics such as the water connections, sewer connections, the city conditions, and the market. Elkhorn knew that the city had a limited number of sewer permits. Elkhorn also discussed with Mr. Garner, petitioner's engineer, the tentative map conditions and easements on the Exchange Property. Deciding it would be profitable to purchase the Exchange Property, on April 13, 1989, Elkhorn agreed to purchase the Exchange Property from Gold Coast/Amerasian. On May 16, 1989, Elkhorn purchased the Exchange Property from Amerasian for $776,000.

In Resolution No. 1989-21, dated April 24, 1989, the city of Beaumont authorized and consented to the filing of the Final Map for Tract No. 22332. On May 16, 1989, Elkhorn recorded the final subdivision map for Tract No. 22332, creating 48 lots in the

Exchange Property. The subdivision agreement for Tract No. 22332 was approved by the Beaumont City Council on February 13, 1990.

Around June/July 1989, Meadowlark Homes, a successor in interest to Elkhorn, began to install the off-site improvements for the Exchange Property. Meadowlark Homes initially estimated $480,000 ($10,000 per lot) as the cost for off-site improvements.

In a letter dated June 14, 1989, the Beaumont-Cherry Valley Water District informed Meadowlark Homes of a proposed increase in water connection fees, but gave Meadowlark Homes an opportunity to obtain the connections at the existing rate. On June 20, 1989, Meadowlark Homes purchased the water connections at the existing lower rate.

Around September/October 1989, Meadowlark Homes began construction of the 48 houses. Meadowlark Homes first built 24 houses, which were sold for an average price of $140,000. Next, Meadowlark Homes built the second set of 24 houses, but sales of these houses were slower then the first 24 due to a drop in the market at the end of 1990. Ultimately, Meadowlark Homes made a profit of about $630,000 on the sale of the 48 homes.

Tax Return and Accounting Information

Petitioner realized a $428,806 gain from the sale of the Exchange Property. This gain was reported on line 7 of Schedule M-1 attached to petitioner's 1989 return. Respondent in his

notice of deficiency dated July 13, 1995,[5] determined that the exchange did not qualify as a nontaxable exchange under section 1031(a).

Prior to the taxable year 1985, the accounting firm of Sauer, Dudley, McKenzie and Bovee prepared petitioner's financial statements and tax returns.  After taxable year 1985, the accounting firm of Eadie and Payne prepared petitioner's financial statements and tax returns.

From the time petitioner purchased the Beaumont Property until the time petitioner disposed of the property in 1989, petitioner classified the Exchange Property under work-in-progress accounts.

On its return for 1989, petitioner reported its business activity as "RE SUBDIV & DEVELOP" and described the product or service as "OPERATOR-DEVELOP."

OPINION

Generally a taxpayer must recognize the entire amount of gain or loss on the sale or exchange of property.  Sec. 1001(c).  Section 1031(a)(1) provides an exception to the general rule and allows a taxpayer to defer gain or loss from exchanges of

---

[5]  Petitioner signed Form 872, Consent to Extend Time to Assess Tax, extending the time for assessment for the period ended March 31, 1990, until December 31, 1995.

property held for productive use in a trade or business or for investment.[6]  However, the nonrecognition treatment of section 1031(a) does not apply to any exchange of "property held primarily for sale".  Sec. 1031(a)(2)(A).  The test of whether property is held primarily for sale or for investment is applied at the time of the exchange.  See Cottle v. Commissioner, 89 T.C. 467, 487 (1987).  Petitioner bears the burden of proving that it had the requisite investment intent.  Click v. Commissioner, 78 T.C. 225, 231 (1982).

Respondent argues that the transaction fails to qualify under section 1031 because petitioner held the Exchange Property primarily for sale.[7]  Petitioner argues that it held the Exchange Property for investment.  Consequently, our focus is solely upon the characterization of the Exchange Property.

For purposes of section 1031, neither the Code nor the regulations define "held for investment."  The regulations provide that "[u]nproductive real estate held by one other than a

---

[6]  Sec. 1031(a)(1) provides:

In General--No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.

[7]  Respondent has not challenged the applicability of sec. 1031 on any other ground.

dealer for future use or future realization of the increment in value is held for investment and not primarily for sale". Sec. 1.1031(a)-1(b), Income Tax Regs.  In Bolker v. Commissioner, 760 F.2d 1039, 1045 (9th Cir. 1985), affg. 81 T.C. 782 (1983), the court stated that "a taxpayer may satisfy the 'holding' requirement by owning the property, and the 'for productive use in trade or business or for investment' requirement by lack of intent either to liquidate the investment or to use it for personal pursuits."

For purposes of section 1031, neither the Code nor the regulations define "held primarily for sale."  Whether property is "held primarily for sale" is a question of fact.  In the context of section 1221, the Supreme Court held that the term "primarily" means "of first importance" or "principally."  Malat v. Riddell, 383 U.S. 569, 572 (1966).

In analyzing "primarily for sale," petitioner relies on the factors established in section 1221 cases, which are used to determine whether property was primarily held for sale to customers in the ordinary course of business:

(1)  The purpose for which the property was initially acquired;
(2)  the purpose for which the property was subsequently held;
(3)  the extent to which improvements, if any were made to the property by the taxpayer;
(4)  the frequency, number, and continuity of sales;
(5)  the extent and nature of the transactions involved;
(6)  the ordinary business of the taxpayer;

      (7)  the extent of advertising, promotion, or other active
           efforts used in soliciting buyers for the sale of the
           property;
      (8)  the listing of property with brokers; and
      (9)  the purpose for which the property was held at the time
           of sale.

Maddux Constr. Co. v. Commissioner, 54 T.C. 1278, 1284 (1970).

None of the factors are conclusive standing alone, but rather all

of the factors taken as a whole govern.  Id.

     Respondent correctly points out that section 1221 applies a

different standard than section 1031.  See Black v. Commissioner,

35 T.C. 90, 96 (1960).  Section 1221(1) excludes from the term

"capital asset" property "held by the taxpayer primarily for sale

to customers in the ordinary course of his trade or business".

(Emphasis added).  Unlike section 1221, the qualifying language

of section 1031 omits the phrase "to customers in the ordinary

course of his trade or business".  Because section 1031(a)(2)(A)

deals only with property "held primarily for sale," this is the

only requirement for the applicability of the exception to

section 1031.  Id.; see Woodbury v. Commissioner, 49 T.C. 180,

197 (1967); Land Dynamics v. Commissioner, T.C. Memo. 1978-259.

     In determining whether the Exchange Property was "held

primarily for sale," the factors presented in section 1221 cases,

such as Maddux Constr. Co. v. Commissioner, provide guidance in

making this determination, but we are not concerned with factors

analyzing whether the property was sold "to customers in the

ordinary course of * * * business" or whether the property was

held in petitioner's "trade or business."  See Black v. Commissioner, supra at 96 (Court rejected taxpayer's argument that property acquired in a like-kind exchange but held primarily for sale should come within section 1031 if the sale was not within the taxpayer's ordinary course of business); Paullus v. Commissioner, T.C. Memo. 1996-419.  As a result, the exclusion of "property held primarily for sale" from nonrecognition treatment in section 1031(a)(1) is broader than the exception to capital gain treatment in section 1221(1).

Purpose For Which Beaumont Property Was Initially Acquired

Petitioner argues that its original intent in purchasing the Beaumont Property was to construct duplex or four-plex rental apartment units.  According to petitioner, its intent was to hold such units for long-term investment.  Petitioner relies on Mr. Baker's testimony regarding discussions with his broker Carl Mellor about rezoning the property to multi-family use.

We do not find Mr. Baker's statements regarding petitioner's original intent persuasive.  In direct contrast with the assertion that petitioner intended to hold the property for construction of duplex or four-plex rental units, its purchase was contingent upon the tentative subdivision map for the Beaumont Property being approved by the city of Beaumont.  This tentative map proposed to subdivide the property into 48 lots for

the construction of <u>single-family</u> residential houses.[8]
Petitioner did not make the purchase contingent on getting R-4
multi-family residential zoning.

Further, when petitioner purchased the Beaumont Property on
March 10, 1978, the property was zoned R-1 for single-family
residential homes.  Afterwards, petitioner never made any
attempts to have the Beaumont Property rezoned to multi-family
residential use.  The Beaumont Property was not suitable for
commercial development (such as a fast-food location).

From the evidence, we find that petitioner's initial purpose
in acquiring the Beaumont Property was to hold the property for
sale (subdivide the property into lots for single-family
residential houses).

Intent After Acquisition

"[W]hile the purpose for the acquisition must be given
consideration, intent is subject to change, and the determining
factor is the purpose for which the property is held at the time
of" the exchange.  <u>Eline Realty Co. v. Commissioner</u>, 35 T.C. 1, 5
(1960); see <u>Cottle v. Commissioner</u>, 89 T.C. at 487.  Thus, we
must decide whether petitioner abandoned its original intent and

---

[8]  At trial, Mr. Baker testified that the lot sizes and
configurations of the tentative map would be suitable for the
construction of duplexes.  However, the tentative map
specifically proposed single-family residential houses.

thereafter at the time of the exchange held the property for investment.

In an attempt to show its later intent, petitioner points out that only after purchasing the Beaumont Property did its broker Mr. Mellor inform petitioner that it would not be able to get the Beaumont Property rezoned. It is argued that at this point petitioner decided not to subdivide the Beaumont Property, but instead, decided merely to process a tentative map to determine conditions for development of the property. After determining the conditions, petitioner would be able to analyze the costs and feasibility of development.

According to petitioner, after obtaining approval of the 1980 tentative map (which contained conditions for development of the property), it was decided that development of the Beaumont Property was not feasible because the cost of off-site improvements was too high for the construction of entry-level homes. Petitioner asserts at this point it held "the property without any specific plan of action."

Other evidence indicates that petitioner had an intent to subdivide the property (such as the discussion with C.H. J. Materials Laboratory, Inc., regarding a soil investigation report). On April 23, 1979, petitioner's Board of Directors authorized the preparation and filing of an application to the Real Estate Commissioner of the State of California for a Public

Report in connection with the subdivision and sale of real property on the 48 lots of the Beaumont Property.  This reinforces the conclusion that as of April 23, 1979, the Board of Directors decided to subdivide the Beaumont Property.  Also, Mr. Baker testified that he felt that petitioner would go ahead and try to subdivide it into single family houses, which resulted in a series of changes in the tentative map over a period of several years.

Subsequent Intent in Regard to the 14 Lots vs. the 48 Lots

Contemporaneous facts, not self-serving testimony given years later, are important in establishing intent.  Philhall Corp. v. United States, 546 F.2d 210, 215 (6th Cir. 1976); Raymond v. United States, 511 F.2d 185, 190 (6th Cir. 1975).  In establishing its intent, petitioner relies heavily on Mr. Baker's statements.  In evaluating these statements, we examine them in light of the events that transpired from 1978 until the exchange in 1989.

In particular, we examine petitioner's development of the 14 lots in Tract No. 10018-1 and petitioner's actions in regard to the Exchange Property because intent may vary from tract to tract.  See Mathews v. Commissioner, 317 F.2d 360, 361 (6th Cir. 1963).

Based on the city of Beaumont's construction of improvements along Pennsylvania Avenue in 1981 and 1982, petitioner asserts

that it changed its intent with respect only to the 14 lots fronting Pennsylvania Avenue. It contends that Mr. Baker made a determination that the 14 lots could be inexpensively subdivided and that entry-level houses could be profitably built on Tract No. 10018-1. From that time forward, petitioner's intent was to hold the 14 lots for sale. After obtaining the final map for Tract No. 10018-1, petitioner ultimately subdivided the 14 lots, constructed the 14 houses, and sold the 14 houses.

Petitioner asserts that its intent in regard to Tract No. 10018-1, held for sale, differed from its intent in regard to the Exchange Property. Mr. Baker testified that at the time of the filing of the final map for the 14 lots fronting Pennsylvania Avenue, he had already decided that constructing homes on the remaining portion of the property was not feasible. Petitioner contends that it partitioned the 48 lots constituting the Exchange Property from the rest of the tract, as evidenced by the recording of the final map relating only to the 14 Lots and excluding the Exchange Property.[9]

---

[9] The fact that the final map only pertained to the 14 lots fronting Pennsylvania Avenue does not lead to the conclusion that the Exchange Property was held for investment. It is possible that petitioner partitioned the property for other reasons, such as minimizing the bond to be posted for improvements on the property.

We note that a letter, dated Sept. 28, 1983, written by Garner, Troy & Associates, Inc., and signed by Mr. Baker, implied that petitioner would undertake in stages the development of the entire tract:

(continued...)

Petitioner primarily relies on Mr. Baker's statements to determine its intent at the time of the exchange. In support of its intent not to subdivide the Exchange Property, petitioner lists several factors: (1) Cost of off-site improvements, (2) lack of housing market, (3) other obstacles, and (4) health concerns. According to petitioner, the primary reasons for not subdividing the Exchange Property were the cost of the off-site improvements and its unsuccessful sales record in selling the 14 lots in Tract No. 10018-1.

(1) Feasibility of Development (Off-Site Costs)

Petitioner claims that the cost of off-site improvements prohibited development of the 48 lots in the Exchange Property. As a result, petitioner argues that it held the Exchange Property for investment. In regard to the Exchange Property, petitioner received an estimate of off-site costs in 1987 in the amount of $389,435.81, and received another estimate in 1988 in the amount

---

[9](...continued)
On behalf of our client Neal T. Baker Enterprises Inc. owner of approved Tentative Tract No. 10018 we hereby request permission to phase Tract 10018. Our client wishes to initially improve and build on lots adjacent to Pennsylvania Avenue (Lots 1-14 as shown on the attached print of a copy of the approved Tentative map from Tract 10018).

Although it is the owner's intent to phase this Tract into two phases, defining the initial Tract by number 10018-1; subsequent phases, if any, would be defined as Tract No. 10018-2, Tract No. 10018-3 etc., with the number 10018 defining the last phase. Improvement plans, street, sewer, water grading etc. shall be modified to correspond and made compatible for any and all phases to the satisfaction of the city of Beaumont.

of $490,560. Petitioner compares these estimates to the off-site costs incurred in regard to the 14 lots of approximately $5,000 per lot.

In regard to the off-site improvements, respondent submitted an expert report, prepared by Donald Lohr, which estimated the off-site improvement costs for the Beaumont Property. Mr. Lohr estimated off-site improvements for the 14 lots in Tract No. 10018-1 to be $5,821.82 per lot. Using the 1987 cost estimate, to which he then added costs of waterlines and appurtenances plus costs for miscellaneous items, Mr. Lohr initially determined the off-site cost in 1987 was $10,767.74 per lot for the Exchange Property (the 1989 cost would be $11,198.45). In light of information available after filing his report (the 1988 cost estimate), Mr. Lohr determined that the off-site costs were slightly over $12,000 per lot for the Exchange Property. Mr. Lohr stated that these costs associated with Tract No. 10018-1 and Tract No. 22332 were not prohibitive. According to Mr. Lohr, "[t]he [costs] to develop Tract No. 10018-1 were below the average cost to develop single-family lots at that time and the [costs] to develop Tract No. 22332 were no more than average" in relation to those prevailing in 1989.

According to Mr. Kanengiser of Meadowlark Homes, the off-site costs incurred by Meadowlark Homes in developing the Exchange Property were not cost prohibitive. Meadowlark Homes

estimated the off-site improvement costs to be $10,000 per lot. In its development of the Exchange Property, Meadowlark Homes did not encounter any unusual or exorbitant off-site improvement costs, sewer permit costs, water connection costs or other costs related to the construction of the 48 houses.

Petitioner points out several weaknesses to Mr. Lohr's report. One weakness is that Mr. Lohr's report included only an estimate for off-site improvements.[10] Because Mr. Lohr's report was not a full feasibility study, the report excluded consideration of such items as land costs, financing costs, and overhead costs. However, prior to filing its post-trial briefs, petitioner did not draw attention to those items and argued only that the off-site costs made development of the Exchange Property infeasible. Even if petitioner may now extend its position, it offered no evidence of the breakdown of the total costs (other than the off-site costs) to show that total costs presented an impediment to developing the Exchange Property. As noted, petitioner never obtained a feasibility study in regard to the property.

Petitioner also points out that Mr. Lohr's estimate of the off-site costs for each of the 48 lots was roughly double his estimate of the off-site costs associated with each of the 14

_____

[10] Off-site improvements include such things as grading, utilities, electricity, sewer, water, and cable.

lots. Mr. Lohr noted that an estimate of the costs for 14 lots in 1989 would have been $6,642.41 per lot. Petitioner compares this to the roughly $12,000 per lot for the 48 Lots in the Exchange Property. According to petitioner, the estimated profit per home of about $8,000 per lot would be wiped out by the increased off-site cost of $6,000 per lot.

Our evaluation of petitioner's argument is restricted because it did not submit any projected profit analysis for the development (besides Mr. Baker's testimony). In regard to the 14 lots, only after construction did Mr. Baker check the costs and he felt there was a profit somewhere around "4- to 5-, $6,000 per house, maybe a little higher." Later, Mr. Baker testified that petitioner made profit of around $8,000, maybe $8,000 to $10,000.

The parties submitted a summary by petitioner's accountant Eadie and Payne reflecting the following income on the sale of the 14 houses:

| Date of Sale | Address | Selling Price | Income |
|---|---|---|---|
| 07/21/87 | 1202 E. 10th Street | $79,950 | $17,812.74 |
| 09/30/87 | 1050 Pennsylvania Avenue | 87,950 | 21,312.48 |
| 12/22/87 | 1070 Pennsylvania Avenue | 77,950 | 13,469.04 |
| 01/08/88 | 1090 Pennsylvania Avenue | 87,950 | 25,859.29 |
| 09/16/88 | 1010 Pennsylvania Avenue | 89,500 | 23,297.54 |
| 09/23/88 | 1110 Pennsylvania Avenue | 77,950 | 12,891.26 |
| 11/17/88 | 1202 E. 11th Street | 79,950 | 13,133.62 |
| 11/22/88 | 1201 E. 11th Street | 77,550 | 13,502.00 |
| 01/27/89 | 1130 Pennsylvania Avenue | 80,950 | 13,403.44 |
| 02/10/89 | 1120 Pennsylvania Avenue | 89,950 | 22,556.98 |
| 02/28/89 | 1030 Pennsylvania Avenue | 77,000 | 2,875.26 |
| 03/06/89 | 1100 Pennsylvania Avenue | 87,950 | 20,469.47 |
| 03/13/89 | 1140 Pennsylvania Avenue | 89,950 | 23,236.19 |
| 03/31/89 | 1150 Pennsylvania Avenue | 89,950 | 22,667.19 |

According to this, petitioner's income from the sale of the houses averaged $17,606.18.

Petitioner attempts to reduce the profit from the sale of the 14 houses by pointing out that the following costs were not allocated to its construction activities:[11]  (i) the cost of overhead and supervision; and (ii) the interest costs associated with the use of corporation capital to construct the homes. Mr. Baker considered these costs in determining profit from construction activities.

However, Mr. Baker testified that he did not know the costs until petitioner's accountant Eadie and Payne informed him. Further, Mr. Baker testified that he did not know how the accountants accounted for the cost of overhead and supervision. Petitioner did not call its accountants to clarify or explain any of petitioner's cost and profit analysis.  See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946) (drawing negative inference if evidence is within possession yet it is not introduced), affd. 162 F.2d 513 (10th Cir. 1947).  Petitioner also did not incur significant interest costs because it generally used cash on hand, avoiding construction financing.

While petitioner criticizes Mr. Lohr for not preparing a pro forma budget for the project, it provided no evidence to

---

[11]  Respondent suggested a profit of $17,606.18 per house, while petitioner asks the court to accept an average net profit of approximately $7,000 to 10,000 per home.

establish petitioner's projected budget for costs or its estimated profit (or loss).  Additionally, petitioner argues that Mr. Lohr's statement that the costs for the 48 lots were "no more than average" does not change the fact that Mr. Baker believed that the cost per lot was too expensive for building entry-level homes.  However, petitioner provided no evidence to support Mr. Baker's statements.  Petitioner acknowledges this:[12]  "The only testimony before the court is the testimony of Baker who testified that he concluded that it would not be profitable to do so."  We are reluctant to accept Mr. Baker's conclusion.

We find that the off-site costs for the Exchange Property were not prohibitive in regard to petitioner's development of the Exchange Property.

---

[12]  Mr. Garner, petitioner's engineer, mentioned a conversation with Mr. Baker: "I don't know whether he used the word 'horrendous,' but he used some terminology saying the this was far, far more than the other 14 lots would cost him, and he was discouraged at this amount."  Petitioner uses the statement to support its position that the costs were exorbitant, but the statement merely shows what Mr. Baker told Mr. Garner about the costs.

(2) Housing Market and Sales

Petitioner also asserts that another factor in petitioner's determination not to develop the 48 lots was the unsuccessful sales program for the 14 lots in Tract No. 10018-1. In light of the slow sales, petitioner concluded that a market for entry-level homes in Beaumont did not exist.

On or about October 1986, petitioner contracted for the construction of 14 single family residences in Tract No. 10018-1. The 14 houses were constructed in two phases, the first phase consisting of 6 houses (construction commenced on October 17, 1986) and the second phase consisting of 8 homes (construction commenced on June 25, 1987).

Mr. Baker testified that the sales of the first six homes were slow, at a rate lower than anticipated or acceptable to petitioner. Mr. Baker remarked that petitioner held the completed homes for an average for 9 months. The second phase sold quicker, but sales were still unacceptable to petitioner. Mr. Baker felt that it was not worth further subdividing the property due to the slow sales, the amount of money expended, and the trouble of building the 14 houses.

In regard to the holding period, petitioner relies on the fact that the 14 houses sold from July 21, 1987, to March 31, 1989, which is approximately a 20-month span. Additionally, petitioner points out that only three houses sold during 1987 and

that the house located at 1030 Pennsylvania Avenue took approximately 19 months to sell.

However, petitioner's arguments oversimplify the facts. In determining the holding period, we need to know when the houses were completed and compare this to the sales dates. Examining the record, we find the final inspection date of each of the 14 houses. Mr. Baker stated that each house was completed (except for the appliances, fixture, carpets) and ready for sale prior to the final inspection date. Due to problems in the area (vandalism, etc.), in some instances the final inspection did not occur until shortly before the house was sold. But petitioner presented no evidence to show when the houses were substantially completed.

The final inspection date and the sale date for each house are as follows:

| Final Inspection Date | Date of Sale | Address | Phase |
|---|---|---|---|
| 07/10/87 | 07/21/87 | 1202 E. 10th Street | 1 |
| 07/23/87 | 09/30/87 | 1050 Pennsylvania Avenue | 1 |
| 07/23/87 | 12/22/87 | 1070 Pennsylvania Avenue | 1 |
| 07/23/87 | 01/08/88 | 1090 Pennsylvania Avenue | 1 |
| 07/23/87 | 09/16/88 | 1010 Pennsylvania Avenue | 1 |
| 08/23/88 | 09/23/88 | 1110 Pennsylvania Avenue | 2 |
| 08/23/88 | 11/17/88 | 1202 E. 11th Street | 2 |
| 10/31/88 | 11/22/88 | 1201 E. 11th Street | 2 |
| 01/23/89 | 01/27/89 | 1130 Pennsylvania Avenue | 2 |
| 02/06/89 | 02/10/89 | 1120 Pennsylvania Avenue | 2 |
| 07/23/87 | 02/28/89 | 1030 Pennsylvania Avenue | 1 |
| 10/21/88 | 03/06/89 | 1100 Pennsylvania Avenue | 2 |
| 02/23/89 | 03/13/89 | 1140 Pennsylvania Avenue | 2 |
| 02/27/89 | 03/31/89 | 1150 Pennsylvania Avenue | 2 |

According to petitioner's records, the house at 1030 Pennsylvania Avenue in Phase 1 (which was completed on or before 7/23/87 and sold 2/28/89) was the model home; so the long holding period for this house is not significant. Treating the final inspection date as the date of completion and the sale date and excluding the sale of the model home, petitioner held the houses in Phase 1 for about 5.3 months apiece and held the houses in Phase 2 for about 1.3 months apiece. In light of the evidence, we are not persuaded by Mr. Baker's testimony that sales of the 14 houses were unacceptably slow.

Meadowlark Homes' Success with the Exchange Property

Respondent uses Howard Kanengiser's (of Meadowlark Homes) testimony to establish the market for the development of the Exchange Property. Meadowlark Homes experienced brisk sales in 1989 in regard to the first 24 homes. In 1990, due to the recession, Meadowlark Homes experienced a drop off in sales in regard to the second 24 homes. Meadowlark Homes made approximately $630,000 in profit on the development. This was approximately one-third less than Meadowlark had anticipated.

In regard to Meadowlark's slower sales for the second phase, petitioner argues that this supports its position that it held the Exchange Property for investment because Mr. Baker foresaw the poor sale of homes in Beaumont based on (i) the poor sales record on the first 14 homes, (ii) the fact that Beaumont is a

low-income area that failed to share in the Southern California housing boom, and (iii) his experience in the banking business. However, Mr. Kanengiser's testimony indicated that the recession was unforeseeable.

In discounting the relevance of Mr. Kanengiser's testimony, petitioner points out the difference between Meadowlark Homes' development and petitioner's development:

(1) Meadowlark Homes built houses with an average selling price of $140,000 while petitioner built "entry level housing" in the $70,000 to $100,000 range; and

(2) Meadowlark Homes borrowed approximately $6,000,000 to finance the project while petitioner used working capital, borrowing no more than $400,000.

Mr. Baker testified that petitioner was not equipped for more than entry-level houses.

We know that petitioner's 14 houses in Tract No. 10018-1 sold in the price range of $77,000 to $89,950 and that Meadowlark Homes upgraded petitioner's plan selling its houses for about $140,000. At trial, there was testimony presented regarding the market in the city of Beaumont. Mr. Dotson, the city's engineer, and Mr. Bounds, the city's manager, testified to the increased real estate market in Beaumont from 1985 until the recession in 1990. Other than Mr. Baker's testimony, petitioner presented no market data on sales in Beaumont. Mr. Baker admitted he was generally unaware of the general level of income in Beaumont and had merely an impression of the market. We are not convinced that the market in Beaumont supported only the upgraded houses of

Meadowlark Homes and did not support petitioner's type of development as well.

Further, there was no evidence presented to establish that petitioner was equipped only for entry-level houses.

In regard to petitioner's second point, petitioner did not establish that its borrowing policy limited the type of house built and the number of houses built.[13]

From the record, we find that a market for single-family residential homes existed at the time of the exchange in 1989. Petitioner has not persuaded us that the market did not support its development of "entry-level low income houses."

(3) Other Obstacles

Petitioner also asserts that other obstacles arose in connection with subdividing the 48 lots, which led to Mr. Baker's conclusion that development of the Exchange Property would not be profitable.

First, petitioner points to the fact that Beaumont-Cherry Valley Water District was increasing its water connection fee by approximately $450 per lot. However, in June 1989, Meadowlark Homes was able to purchase the water connection at the existing rate (prior to the increase).

---

[13] Mr. Baker testified that the maximum loan obtained by petitioner was $400,000. However, petitioner authorized its officers to obtain construction financing. For example, in the taxable year 1989, petitioner had a $700,000 construction line of credit which expired in Feb. 6, 1991.

Next, petitioner points to communications by the city of Beaumont of a possible limitation in sewer permits.[14] Sewer permits play a necessary role because in order to begin construction, building permits and sewer permits are both required. We note that there was concern about the city's sewer capacity in 1988. The city began to investigate the building of a new sewer plant. While the city manager Mr. Bounds was the only person who knew the number of available permits, there was no evidence presented regarding any discussion of sewer permits between petitioner and him. Meadowlark Homes was able to acquire sewer permits for the 48 lots in the Exchange Property. Further, as of 1993, the city of Beaumont had not run out of sewer permits. In light of the above, we find that availability of sewer permits was not an obstacle to petitioner's development of the Exchange Property.[15]

### (4) Health Concerns

At trial, petitioner introduced evidence of Mr. Baker's health. In November 1988, he was diagnosed with cancer. He had a

---

[14] However, Mr. Baker testified that he decided not to subdivide the Exchange Property before learning about the potential of a moratorium.

[15] In its reply brief, petitioner attempts to show that Mr. Baker's decision to not record the final map in light of the threat of a moratorium shows that it was petitioner's intent to not develop the Exchange Property. However, we find little significance to petitioner's characterization in light of the lack of evidence regarding the threat.

fifty-fifty chance of survival. In November 1988, Mr. Baker underwent surgery, which was followed by chemotherapy. Mr. Baker testified that as a result of contracting cancer, he made a decision that petitioner would discontinue subdividing land; thereafter, petitioner built some homes on existing lots but no longer subdivided raw land into lots.

As petitioner's main decision maker, Mr. Baker's health impacts petitioner, but we are examining petitioner's intentions in regard to the Exchange Property in 1989 and not necessarily petitioner's decisions regarding other aspects of its trade or business.

We first consider Mr. Baker's statement that he spent only 20 percent of his time at the time of exchange working for petitioner, while he spent the other 80 percent of his time supervising the food operations of Baker's Burgers, Inc. Mr. Baker and Terry Talley managed petitioner's construction activities. Because petitioner subcontracted all of its construction work, the actual number of permanent employees employed by petitioner or Mr. Baker's diminished time with petitioner is of little significance.

Petitioner presented no evidence of actions of its Board of Directors to corroborate Mr. Baker's statement that petitioner no longer was subdividing land. Instead, we note that on Form 1120, for the taxable years 1988, 1989, 1990, and 1991, petitioner

listed "subdivider and developer" instead of "real estate operator and lessor of building" as its principal business activity.

Additionally, the evidence shows that petitioner continued its subdividing and developing activities. For example, petitioner continued to build houses on the 20-lot tract in Yucaipa after petitioner allegedly discontinued developing, recording the income from the sale of the houses as ordinary income in 1990, 1991, 1992, and 1993. In regard to these other developments by petitioner, we know that it continued to hold these properties for sale, rather than investment. The record does not substantiate petitioner's assertion that it built homes on existing lots and no longer subdivided raw land into lots.

Mr. Baker's mere statements that petitioner intended to discontinue the development business are not enough to change the characterization of the Exchange Property. See Tollis v. Commissioner, T.C. Memo. 1993-63, affd. per curiam without published opinion 46 F.3d 1132 (6th Cir. 1995). Petitioner presented no objective and contemporaneous evidence to establish its change in intent. Considering petitioner's actions, Mr. Baker's health concerns do not persuade us to accept petitioner's conclusion that it stopped its subdividing and developing activities.

Other Evidence--Petitioner's Actions

While petitioner's intent at the time of the exchange is critical, it primarily relies on Mr. Baker's statement to establish its intent, without examining the actions of petitioner as a corporation.  See Raymond v. United States, 511 F.2d 185, 190 (6th Cir. 1975).

Ordinary Business

Several courts have considered whether a taxpayer's real estate operations were limited to the properties in question or were engaged in as part of a general real estate business.  Eline Realty Co. v. Commissioner, 35 T.C. at 5 (discussing this point in the context of a predecessor of section 1221); Maddux Constr. Co. v. Commissioner, 54 T.C. at 1284.  We recognize that a taxpayer in the real estate business may also acquire and hold real property for investment purposes.  Maddux Constr. Co. v. Commissioner, supra at 1286 (dealing with section 1221).  The taxpayer has the burden of proving that when dealing with the property it was wearing the hat of an investor rather than that of a dealer.  Pritchett v. Commissioner, 63 T.C. 149, 164 (1974). In determining this, we accord greater weight to the objective facts than to petitioner's statements regarding investment intent.

Further, "a subsequent sale is not conclusive on the question of the primary purpose in acquiring and holding the real

estate."  Municipal Bond Corp. v. Commissioner, 382 F.2d 184, 188 (8th Cir. 1967), revg. in part and affg. in part 46 T.C. 219 (1966) (dealing with section 1221).  The fact that land was held for many years does not, by itself, establish an intention to hold the property for investment rather than sale.  See Stockton Harbor Indus. Co. v. Commissioner, 216 F.2d 638, 655-656 (9th Cir. 1954).

In claiming that it held the Beaumont Property and the Exchange Property for investment purpose, petitioner asserts that its subdividing and developing activities were very limited.[16] Petitioner points out that it sold all of its houses through unrelated realtors and that it did not engage in any construction activities, instead it used subcontractors.  Petitioner contends that the heart and soul of petitioner related to the location, development, and construction of fast food sites to be held for investment.  Petitioner states that a majority of its income is derived from the rental of fast-food locations[17] (Mr. Baker

---

[16]  Petitioner also asserts that it had a history of holding properties for investment, including properties that it at one time intended to develop.  However, the record does not support petitioner's position.

[17]  At times, petitioner blurs the distinction between petitioner and the separate corporation Baker Burger's Inc.  When petitioner spun off in 1969 the fast-food operations to Baker Burger's Inc., Mr. Baker stated that the two businesses were for all practical purposes totally unrelated, and that it had become necessary to conduct the two businesses separately in order to facilitate flexibility, expansion, cost control, proper

(continued...)

having been one of the originators of the fast-food concept in the United States) and other rental properties.

The tax returns provide the following:

|  | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|---|
| Gross Receipts | $184,528 | $410,000 | $927,000 | $1,684,469 | $1,253,850 | $1,210,350 |
| Cost of Goods Sold (cost-houses & lots) | 116,899 | 283,171 | 691,058 | 1,507,664 | 1,070,108 | 1,082,998 |
| Gross Profits | 67,629 | 126,829 | 235,942 | 176,805 | 183,742 | 127,352 |
| Gross Rents | 613,758 | 688,147 | 733,308 | 841,314 | 1,413,983 | 1,834,533 |
| Net Capital Gain | 58,536 | 694,880 | 16,774 | 18,545 | 20,351 | -0- |
| Ordinary Gain | 6,308 | -0- | -0- | -0- | -0- | -0- |

Petitioner points out that the financial records divide its operations into rental activities and construction activities. It argues that its profits from construction activities range from 6.5 percent to 24.3 percent, indicating a trend of decreased profits from construction activities and of increased profits from rental activities over the period.  In making this argument, petitioner compared gross profits from construction activities to gross rents.  Presented with only petitioner's financial returns, we cannot accept its conclusion that construction of property held for sale was a minor portion of its activities, when petitioner had gross receipts of $1,253,850 in 1988 and $1,210,350 in 1989, compared to gross rents of $1,413,983 in 1988 and $1,834,533 in 1989.

---

[17](...continued)
management and the raising of capital.

Furthermore, for each taxable year 1982 through 1991, on Form 1120, petitioner listed "real estate subdivider and developer" as its principal business activity.[18]  While "real estate operator and lessor of buildings" is an option provided in the Instructions to Form 1120, during 1981 to 1991, petitioner never listed "real estate operator and lessor of buildings" as its principal business activity.

In taxable year 1987, on Form 3115, petitioner stated that its business and principal income was "real estate subdivider and developer, real estate rentals," and affirmatively answered that it produced or acquired property for resale to which section 263A applied.

Mr. Baker testified that petitioner was in the business of subdividing and developing prior to 1990.  However, petitioner asserts that this is true only to the extent that the subdivision and development activities related to the eventual construction of fast-food stores or, in some circumstances, single-family residences.  Mr. Baker stated that of the 80 fast-food locations owned by petitioner, it built approximately 50 of them.  While his testimony is unclear and undocumented, it seems that

---

[18]  Even though petitioner listed the wrong code number for real estate subdivider and developer from 1982 through 1991, petitioner specifically stated its business as real estate subdivider and developer.

petitioner constructed the 50 locations over a period from prior to its incorporation in 1957 to the date of the trial. Besides Mr. Baker's statement of constructing fast-food locations, petitioner did not present any evidence regarding subdivision activities on property on which fast-food stores were later constructed.

On the other hand, we note that petitioner was engaged in developing other properties (in addition to the Beaumont Property) from 1978 to 1991. Petitioner purchased 75 unimproved lots in Pacific Street in Highland, California. Petitioner built 25 houses, installed improvements on the remaining 50 lots, and sold all the lots in 1980. Petitioner also had development projects in San Bernardino, Yucaipa (20 lots, which were purchased in 1986 for the purpose of building houses thereon and to sell the houses upon completion), and La Quinata (20 lots, which were purchased in 1988).

We agree with petitioner that it was engaged in several activities, which included acquiring and holding real estate for fast-food locations (which were later leased to Baker's Burgers).[19] At the same time, we find that petitioner also was

_____

[19] Petitioner states that:

Its activities included the following (i) holding raw land for investment purposes, (ii) holding fee title to fast-food locations for rental to Baker's Burgers, (iii) acting as master lessor to Baker's Burgers with respect to fast-food
(continued...)

engaged in the business of subdividing and developing before and during the taxable year 1989.[20]  We note that section 1031 use of "held primarily for sale" does not require that the property be sold in the ordinary course of petitioner's trade or business (as provided in section 1221(1)).

### Books and Records

Courts have used a taxpayer's books and records as evidence of an intent to change the character of an asset.

As of March 1979, petitioner classified the Beaumont Property in Account No. 1160 for finished houses and work-in-

---

[19](...continued)
locations which were leased from third parties, (iv) developing new fast-food sites for Baker's Burgers and leasing those new sites to Baker's, (v) leasing fast-food sites to third parties, and (vi) constructing homes for sale.

[20]  Respondent asserts that a real estate "subdivider" is one that obtains land, goes through the process of filing a final map to subdivide property into lots, and sells the lots. And that a real estate "developer" is one that obtains the lots, installs the improvements on the lots, builds houses on the lots, and sells the houses.
        Petitioner contends that respondent's analysis of the term "subdivider" and "developer" is inaccurate.  Petitioner states that:  "With respect to the homes built by Enterprises, it was its practice to either purchase subdivided land or to both subdivide land and construct homes on the subdivided lots."
        Mr. Dotson testified that there is potential for overlap in the terms "subdivider" and "developer."
        We need not worry about the exact definition of subdivider and developer because we find that petitioner was engaged in the business of both, depending on the development.  To the extent properties were subdivided, petitioner intended to build improvements on these properties.  Further, while petitioner contends it no longer subdivided raw land into lots after 1988, the record does not support this contention.

progress, with the following description "Beaumont Subdivision (Tract 10018) 46 unimproved lots." In regard to the 14 lots in Tract No. 10018-1, the lots were recorded in work-in-progress/construction-in-progress account and finished houses account. Petitioner never moved the property from these accounts. Petitioner also listed the Exchange Property, Tract No. 22332, under the category of work-in-progress/construction-in-progress (Account No. 1160), and never moved the Exchange Property from that account during the period of 1978 to 1989.

Petitioner asserts that the characterization of the Exchange Property as work-in-progress was made by its accountants without Mr. Baker's knowledge. Mr. Baker claims that the accountants incorrectly classified properties under work-in-progress accounts. Petitioner points out that many properties that were clearly held for investment (such as fast-food stores) were listed under the work-in-progress category. It attempts to categorize the work-in-progress category as a suspense account used to keep track of expenses. Petitioner concludes that the Exchange Property was listed under the work-in-progress account because the petitioner made expenditures for engineering costs associated with the property.

In its assertions that properties were listed inconsistently, petitioner solely relies on Mr. Baker's statements about its use of the properties and the

misclassification of its properties. Even though petitioner's accountants were listed as witnesses in the pretrial memorandum, it never called the accountants to explain, verify, or discuss why properties were recorded in a certain manner. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. at 1165. Further, petitioner did not provide any other evidence to explain its manner of accounting for the properties.

We note that petitioner's characterization of the Exchange Property in its records is consistent with its treatment of the Pacific Street Subdivision in Highland, California. In regard to 75 lots in the Pacific Street Subdivision, petitioner built 25 houses, and installed only improvements on the remaining 50 lots. However, petitioner kept all 75 lots in the work-in-progress account until they were sold in 1980. Petitioner classified income from the sale of the houses and the unimproved lots as ordinary income. Petitioner also listed its residential development in Yucaipa under work-in-progress account No. 1160-81, and its residential development in La Quinata under work-in-progress account No. 1160-85.

This is compared to petitioner's treatment of the Leedom Tract, 41 unimproved lots. While Leedom was initially in 1978 classified in the work-in-progress account, petitioner later in 1985 reclassified the property into the "unimproved land and vacant lots" account No. 1280-31. In regard to the Exchange Property, which was unimproved land, petitioner never moved the

property from the work-in-progress account into the unimproved land and vacant lot account.

In regard to investment properties, petitioner listed the properties (such as the Fontana drive-in, the Fontana coffee shop, the Kendall drive-in, and the Banning drive-in) under the land account no. 1210, under the building account no. 1220, or under the undeveloped or vacant land account. Some investment properties were listed under the work-in-progress accounts temporarily. Later (after completion of the buildings, though this is not entirely clear), the properties were moved to land accounts, building accounts, or undeveloped land accounts.

Presented only with the accounting records and Mr. Baker's statements, we are not persuaded that Mr. Baker's conclusions that petitioner's accountants misclassified properties on its financial records are accurate.

As with its other subdivision properties, petitioner listed the Exchange Property in the work-in-progress account from 1983 to 1989. Further, petitioner never moved the Exchange Property out of the work-in-progress account (even though petitioner alleges it decided in 1983, or later in 1987-88 after completion of the 14 lots, not to subdivide the Exchange Property). This treatment reflects petitioner's intent to keep the inactive phase of the 48 lots in the Exchange Property in the work-in-progress account until development of the houses.

Improvements

We note that petitioner did not make any improvements on the Exchange Property. However, the fact that the property was not developed when it was sold does not, standing alone, require a conclusion that it was held for investment. See Kesicki v. Commissioner, 34 T.C. 675, 679 (1960).

Activity: Map Process

Petitioner contends that there were little or no activity in regard to the Exchange Property. See Olivieri v. Commissioner, T.C. Memo. 1966-177. We disagree. In regard to the Exchange Property, petitioner resubmitted the tentative map. The tentative map was approved on June 9, 1986.[21] Afterwards, petitioner proceeded to obtain a final map regarding the Exchange Property. Between May 6, 1986 and May 16, 1989, petitioner worked with Mr. Dotson, the engineer for city, to revise the conditions of approval, including the cost estimate. During this period, Dotson revised the conditions. These discussions led to petitioner being able to lock-in the lower city development fees for the Exchange Property.

As of March 18, 1988, the final map on the Exchange Property was approved and ready to be recorded once petitioner obtained the required signatures. As of the date of the exchange, the

---

[21] A tentative map shows the design and improvement of a proposed subdivision and the existing conditions, but it cannot be recorded. Cal. Govt. Code secs. 66424.5(a), 66429 (West 1997).

final map had not been recorded by petitioner, but Elkhorn recorded the final map regarding the Exchange Property on May 16, 1989 (the date of the exchange).

While petitioner de-emphasizes its efforts from 1983 to 1989, petitioner spent time and money in getting the final map ready to be recorded, from filing applications to discussions with city employees regarding conditions. The mapping process is an involved and time-consuming process.[22] While the tentative map is only a conceptual plan, the final map is a legal document, which gives the landowner the right to build under certain conditions.

In explaining petitioner's action regarding the map process, it asserts that "[a]t the urging of his engineer, Baker authorized the processing of a new tentative map (No. 22332)." Later, petitioner asserts that it continued the process "because that'd be about the only way [it] would ever sell [the property], is to show someone what could be done on that property." Petitioner viewed the process of obtaining a tentative map as a method of determining the economic feasibility of developing property.

Petitioner notes that the only way a landowner can determine the feasibility of developing a property is to process a

---

[22] The process of obtaining a final map can take from 6 months to 17 years. It involves numerous stages of review, comment, and revision until the final map and improvements plans are approved.

tentative map.  We note Mr. Dotson's testimony that submitting a tentative map is not required to determine costs and the project's profitability.  However, using the process of tentative maps is one means to determine costs and conditions for development.

In this case, the tentative map for the Exchange Property was approved in June 1986.  Afterwards from 1986 to 1989, petitioner spent 3 years to process the tentative map to the point the final map was ready to be recorded in 1988.  Petitioner states that this process indicated that the development would not be profitable.  In attempting to establish its intent to not develop the property, petitioner stresses the fact that the final map was not recorded by petitioner, and that the final map would have expired in June 1989.  Mr. Garner testified that Mr. Baker "did not feel that he wanted to go ahead with the recording of the map.  So we were never given instructions to finish processing the final map and the street plans."  However, we agree with Mr. Dotson's statement that he did not assign any significance to petitioner's waiting to record the final map.

In our view petitioner went further than merely determining the feasibility of developing the Exchange Property.  Whether petitioner would have let the tentative map on the Exchange Property expire is subject to speculation.  However, we know that petitioner's actions on the Exchange Property made the property more marketable.  By 1988, the final map was ready to be

recorded. Mr. Baker admitted at trial petitioner wanted to sell the Exchange Property to get its money back. While petitioner categorizes this as a vague intent, we find that petitioner expended substantial time, energy, and money in its efforts to develop the Exchange Property. Whether petitioner was going to get its money back by subdividing and developing the property or by selling the raw land, it indicates an intent to liquidate the property. See Bolker v. Commissioner, 760 F.2d 1039, 1045 (9th Cir. 1985), affg. 81 T.C. 782 (1983).

Extent of Marketing the Exchange Property

Petitioner points out that it received an unsolicited offer to purchase the Exchange Property through a broker. Prior to receiving the unsolicited offer for the purchase of the Exchange Property, petitioner did not list the property with a broker for sale, did not advertise it for sale in any way, and engaged in no other marketing efforts relating to the Exchange Property.

At the same time, in connection with the 14 lots, petitioner did not actively market the development; instead, petitioner used unrelated realtors.

Paullus v. Commissioner

In attempting to demonstrate its investment intent, petitioner focuses on the fact that it never recorded the final map of (i.e., never subdivided) the Exchange Property. Petitioner cites Paullus v. Commissioner, T.C. Memo. 1996-419. In Paullus, the Court found that the taxpayer held the property

for investment despite the fact that the taxpayer filed a final map and constructed about $1,600,000 in off-site improvements (with the sales price of $11,250,000) on the property. Id. Petitioner compares the facts in Paullus to its situation, where it did not record a final map and constructed no improvements on the Exchange Property. Petitioner asserts that its activities were minor and preliminary compared to those taken by Paullus.

In making its decision, the Court in Paullus looked at several factors, in addition to the fact of filing a final map and constructing improvements. Ridgemark, the taxpayer in Paullus, segregated its business of operating Ridgemark Golf and Country Club from the development and sales of lots, which were done by two other corporations. Ridgemark consistently reported its business activity as the operation of a golf and country club. The Court noted that Ridgemark's actions (long holding period, only limited sales to its related companies, paucity of purchases and sales) indicated an investment motive in holding the property.

The Court's holding in Paullus was based on the specific factual situation presented in that case. While petitioner argues that the Paullus and this case are similar, we find that the instant case's factual situation is distinguishable from the situation surrounding the taxpayer in Paullus. In Paullus, Ridgemark formed Ridgemark Financial Corp. and Ridgemark Construction Corp. to carry on the residential lot activities.

Ridgemark's main operations were its golf and country club activities. By contrast in this case petitioner was in the subdividing and developing business, choosing to spin off its fast-food operations to Baker's Burgers, Inc. While petitioner asserts its rental activities exceeded its development activities, we do not find support for that assertion in the record. While petitioner did not record the final map, in 1988 it was ready to be recorded.[23] As discussed above, petitioner had taken substantial steps in the development of the Exchange Property.

Conclusion

Petitioner has been active as a subdivider and developer of real estate. It has the burden of proving that when it was dealing with the Exchange Property it was wearing the hat of an investor.

Petitioner acquired the Exchange Property to construct single-family houses for sale. Considering all the factors, we find that petitioner did not establish its investor status in connection with its holding of the Exchange Property. While petitioner presented potential obstacles (high development costs, slow sales, etc.), it did not establish that it discontinued its plans to develop the 48 lots in the Exchange Property. At the

---

[23] In a letter by Elkhorn, dated Apr. 11, 1989, it stated that petitioner was to sign and record the final map before the exchange. In the end, Elkhorn recorded the final map.

time of the exchange, petitioner held the Exchange Property primarily for sale (as evidenced, inter alia, by its effort to make the final map ready to be recorded, its efforts to lock in lower city development fees, and its treatment of the Exchange Property in its books and records).  We conclude that the Exchange Property was held by petitioner primarily for sale within the meaning of section 1031(a)(2)(A) and therefore that the exchange does not qualify for nonrecognition treatment under section 1031(a).

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent.</u>